UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| T.G. and M.G., individually and on behalf of C.G., <br> Plaintiffs, <br><br> v. <br><br> THREE VILLAGE CENTRAL SCHOOL DISTRICT, <br> Defendant. | Case No. 24 Civ. <br><br><br><br><br><br><br> **COMPLAINT** |

## PRELIMINARY STATEMENT

1. The Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* (IDEA) is ambitious legislation enacted in response to Congress' perception that a majority of children with disabilities in the United States "were either totally excluded from schools or were sitting idly in regular classrooms awaiting the time when they were old enough to drop out." *Endrew F. v. Douglas Cnty. Sch. Dist.*, 580 U.S. 386, 400 (2017) (cleaned up). IDEA therefore requires provision of a free appropriate public education (FAPE), an educational program "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 403. Those circumstances include the child's "present levels of achievement, disability, and *potential for growth*." *Id.* at 400 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(IV), (d)(3)(A)(i)-(iv)) (emphasis supplied).

2. IDEA's broad purpose is to enable all children to make progress. "A substantive standard not focused on student progress would do little to remedy the pervasive and tragic academic stagnation that prompted Congress to act." *Endrew F.*, 580 U.S. at 400.

3. Students protected by IDEA also enjoy rights under the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* (ADA) and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Section 504). IDEA, 20 U.S.C. § 1415(*l*), imposes an exhaustion requirement on IDEA-

eligible students asserting ADA and Section 504 claims seeking relief available under IDEA. However, besides this exhaustion requirement, IDEA places no restrictions on ADA and Section 504 claims. "This is essential because a plaintiff may be able to make out an intentional discrimination claim under the ADA even if he receives a FAPE under the IDEA." *Le Pape v. Lower Merion Sch. Dist.*, No. 22-2931, __ F.4th __, 2024 U.S. App. LEXIS 13400, at *24 (3d Cir. June 4, 2024).

4.    Plaintiffs are the parents of C.G., a minor child who is classified as eligible to receive special education pursuant to 20 U.S.C. §§ 1401(3), 1414(b)(4).

5.    In an administrative proceeding held before Impartial Hearing Officer (IHO) Michael Lazan, Plaintiffs presented claims of violations of C.G.'s rights under IDEA, Section 504, and the ADA.

6.    The proceeding before IHO Lazan concluded, after thirteen days of testimony, with a decision in favor of Plaintiffs on one issue, the claim that the District deprived C.G. of appropriate speech services in violation of IDEA during the 2020-21 school year. The IHO dismissed the ADA claims for lack of jurisdiction and denied the Section 504 claim. The IHO decision is attached as Exhibit 1.

7.    Both parties appealed the IHO's decision to the New York State Department of Education, Office of State Review (SRO). *See* 20 U.S.C. § 1415(g); N.Y. Education Law § 4404(2).

8.    On February 28, 2024, SRO Justyn P. Bates rendered his decision, attached as Exhibit 2. The SRO reversed the IHO's ruling awarding compensatory education for inappropriate speech services and affirmed the remainder of the ruling under IDEA. The SRO decided that he lacked jurisdiction to consider the Section 504 claim.

9. For the reasons stated below, Plaintiffs are aggrieved by the decision of the Office of State Review.

## JURISDICTION AND VENUE

10. Jurisdiction is based upon 28 U.S.C. § 1331, as this action arises under the Constitution and laws of the United States, and 28 U.S.C. § 1343(a) in that the claims are asserted under laws providing for the protection of civil rights. The cause of action is provided by 20 U.S.C. § 1415(i)(3).

11. Venue in this district is proper under 28 U.S.C. § 1391(b) because Defendant is a resident of this district and a substantial part of the underlying events occurred in this district.

## PARTIES

12. C.G. is a minor child and a student. He is a "child with a disability" within the meaning of 20 U.S.C. § 1401(3)(A), 34 C.F.R. § 300.8(a) and an individual with a disability as defined by 34 C.F.R. § 104.3(j) and 28 C.F.R. § 35.104.

13. T.G. and M.G. are C.G.'s parents as defined by 20 U.S.C. § 1401(23), 34 C.F.R. § 300.30(a).

14. Plaintiffs reside within Suffolk County, New York, and have resided there at all relevant times.

15. Based on established practice within the Second Circuit, C.G., T.G., and M.G. are named in this Complaint by their initials.[1]

---

[1] *Doe v. Salina*, No. 23-cv-3529, 2024 U.S. Dist. LEXIS 53006, at *15 n.1 (E.D.N.Y. March 25, 2024) (only a minor's initials should be in publicly filed documents and this rule extends to the child's parents); *P.M. v. Evans-Brant Cent. Sch. Dist.*, No. 08-cv-0168A(Sr), 2008 U.S. Dist. LEXIS 1122262, at *8-9 (W.D.N.Y. Sept. 2, 2008) ("[I]n an action commenced by a parent or guardian on behalf of a minor child pursuant to the IDEA, the plaintiffs should be permitted to proceed, as a matter of course, using initials in place of full names in public filings with the Court"); *C.B. v. Pittsford Cent. Sch. Dist.*, No. 08-cv-6462 (CJS), 2009 U.S. Dist. LEXIS 84010, at *13-14 (W.D.N.Y. Sept. 14, 2009)

16. Defendant Three Village Central School District is a municipal corporation created pursuant to Article 51 of the New York State Education Law.

17. Defendant is a Local Educational Agency (LEA) as defined in 20 U.S.C. § 1401(19), 34 C.F.R. § 300.28(a), a recipient of federal financial assistance as defined in 34 C.F.R. § 104.3(h), and a public entity as defined at 28 C.F.R. § 35.104.

## STANDARD OF REVIEW

18. Federal courts do not give unfettered deference to SRO decisions. The court must determine whether the SRO's conclusions were grounded in a thorough and careful analysis. If the court determines that the SRO's conclusions were not supported by a preponderance of the objective evidence, no deference is warranted. *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 248 (2d Cir. 2012).

## STATEMENT OF FACTS

19. C.G. is now sixteen years old and was twelve to fifteen years old during the three school years which are the subject of Plaintiffs' claims. Defendant identified C.G. as a student eligible for special education services when he was in Kindergarten. C.G. has diagnoses of Autism Spectrum Disorder, Level I, with accompanying language impairment; Specific Learning Disorder with Impairment in Reading (Dyslexia); Specific Learning Disorder with Impairment in Mathematics; Attention Deficit Hyperactivity Disorder (ADHD), Predominantly Inattentive Presentation (with associated features of impulsivity); Expressive Receptive Language Disorder; and Auditory Processing Disorder.

20. Plaintiffs brought an administrative proceeding as allowed by 20 U.S.C. § 1415(c)(2), (f) and N.Y. Comp. Codes R. & Regs. tit. 8 § 200.5(i), (j), in which they claimed that the District did not provide a FAPE to C.G. for the 2020-21, 2021-22, and 2022-23 school years.

21. For those three school years, Plaintiffs sought compensatory education to make up for the District's failure to offer a FAPE and failure to provide reasonable accommodations and modifications that would allow C.G. to access his educational program.

22. The administrative record created by the parties in the hearing showed that, for the 2020-21, 2021-22, and 2022-23 school years, the IEPs offered by the District to C.G. did not provide a FAPE because they failed to address documented needs in speech, reading, executive functioning, and transition.

23. The SRO's decision reversing the award of compensatory education in speech was not thorough and well-reasoned for the following reasons:

    a.   The District bears the burden of proving that it complied with IDEA's requirements. Further, the law does not support blind deference to decisions of District personnel. "[D]eference is based on the application of expertise and the exercise of judgment by school authorities. The Act vests these officials with responsibility for decisions of critical importance to the life of a disabled child. The nature of the IEP process, from the initial consultation through state administrative proceedings, ensures that parents and school representatives will fully air their respective opinions on the degree of progress a child's IEP should pursue . . . By the time any dispute reaches court, school authorities will have had a complete opportunity to bring their expertise and judgment to bear on areas of disagreement. A reviewing court may fairly expect those authorities to be able to offer a **cogent and responsive explanation** for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F.*, 580 U.S. at 404 (emphasis supplied).

b. Relying upon the testimony of the District's speech and language therapist about the January 2020 Committee on Special Education (CSE) meeting, the SRO reversed the IHO's holding that the 2020-21 IEP, which drastically reduced C.G.'s speech services, deprived him of a FAPE.

c. The SRO's decision is not thorough and well-reasoned or worthy of deference because he relied upon the testimony of a witness who said she did not recall why the change was made. In fact, the speech and language therapist testified unequivocally that she had absolutely no recollection of the re-evaluation/annual review meeting in January 2020, when the CSE drastically reduced C.G.'s speech mandate. No other District employee could explain the rationale for the change in C.G.'s speech mandate. The District offered no competent testimony to prove that the decision in January 2020 to reduce significantly C.G.'s speech and language services was appropriate.

d. The SRO erred in deferring to the judgment of District personnel who had no recollection of the meeting at which the decision was made to reduce C.G.'s speech services. This is precisely the type of "blind deference" that *Endrew F.* precludes.

24. The SRO's decision affirming the denial of relief for inappropriate reading instruction for the 2021-22 and 2022-23 school years was not thorough and well-reasoned for the following reasons:

a. The Due Process Complaint sought relief because, although there are research-based methods proven to address C.G.'s disabilities in English Language Arts, the

District did not put into place any scientifically proven method or strategy to address his unique educational needs.

b. The SRO ignored documentary evidence that established that testimony of District employees was not accurate. For the 2020-21 school year, C.G.'s case manager and special education teacher for Science, English, and support testified on direct that she was using a modified seventh grade curriculum, presenting the same language arts curriculum that was being learned by other seventh grade students, only at a slower pace.

c. However, documentary evidence established that C.G. was not completing seventh grade work in language arts. For example, Ex. PP is a worksheet, entitled "Writing a Thank You Note" that C.G. completed in his special education class. The documentation for that worksheet indicates that it is first and second grade work. Similarly, Exhibit QQ is a worksheet that C.G. completed in seventh grade that indicates that it is appropriate for grades one through three.

d. C.G.'s seventh grade teacher did not know what C.G.'s reading level was during the 2020-21 school year. She could point to no standardized testing indicating that C.G. made progress in reading.

e. Neither the IHO nor the SRO grappled with the compelling evidence that, although the 2021-22 IEP added a goal for a structured reading program, C.G.'s reading teacher was not delivering Wilson reading instruction with any type of fidelity. Without fidelity of implementation, C.G. was not receiving "explicit instruction, which is specific, organized, and scaffolded lessons that build one skill on top of another." *IHO Dec.* 18.

f.   Although the District added a goal related to sequential, explicit reading instruction in the September 2021 IEP, it failed to implement the specially designed instruction necessary for this goal. Thus, the SRO erroneously concluded that the goal made the IEP "reasonably calculated to enable the student to receive educational benefit in light of his circumstances." *SRO Dec.* 35.

g.   The SRO erred in concluding that the Parents' complaint about implementation of the Wilson Reading Program was not tethered to the IEP because the IEP did not specifically mention Wilson. *SRO Dec.* 36. The goal in the IEP was: "When given explicit, sequential instruction in reading and provided controlled text aligned with his instructional level, C.G. will use learned strategies to decode words." A claim that the District failed to provide explicit, sequential instruction in reading is undeniably "tethered to the IEP."

h.   C.G.'s reading instructor acknowledged that the specific, organized, and scaffolded Wilson program that she was purportedly implementing required completion of two full lessons per week. However, she testified, uncontradicted: "that's not how the program was used at the school because it was impossible to do that with the way the schedule is set up." Based on the dates on the instructor's charting, she did one lesson per week, at best, but more often, it took two full weeks for a single lesson. She testified that her administrator told her to continue with the program even though she could not comply with instructions for the specific, organized, and scaffolded instruction required by the IEP.

i. The SRO explicitly found that the reading teacher did not follow the specific, organized, and scaffolded Wilson reading program, notwithstanding the language of the goal. *SRO Dec.* 41.

j. The SRO's conclusion that C.G. progressed while being instructed in reading in the 2021-22 and 2022-23 school years lacks support in the record.

25. The SRO's conclusion that the District provided appropriate executive functioning supports during the 2021-22 and 2022-23 school years is not thorough and well-reasoned for the following reasons:

a. The District did not meet its burden of establishing that it provided sufficient executive functioning supports when the only evaluative data called for much more intensive services. When there is no countervailing evaluative data to justify failing the follow an independent evaluator's recommendations, a school district cannot ignore those recommendations without offering any justification.

b. The private neuropsychologist testified at length as to the reasons C.G. needed extensive supports in executive functioning. Based on her testing, she testified that daily dedicated 1:1 executive functioning instruction was crucial. The District offered no rebuttal.

c. To address C.G.'s executive functioning needs, the District offered a counseling session two times per month for thirty minutes. There is no evaluative data whatsoever to support this recommendation.

d. Even more concerning, the CSE chair testified unequivocally that the school counselor worked on the executive functioning goal. But the school counselor testified that she did not monitor that goal. The progress report for June for the

2021-22 school year does not include reporting on this goal. The SRO relied upon the fact that two other school employees mentioned "executive functioning" in the present levels of the 2021-22 IEPs. *SRO Dec.* 32 n.28. However, the District cannot meet its burden of proving appropriateness when it cannot even identify who was supposed to be reporting on the goal and there is, in fact, no progress report for one quarter.

e.  The District cited to no evidence to support its decision to ignore the recommendation for a class smaller than 10:1 because of C.G.'s executive functioning needs. The SRO's conclusion that a 15:1 class was appropriate because C.G. had made progress the prior year in such a setting lacks support in the record.

26. The SRO's conclusion that the 2021-22 and 2022-23 IEPs provided appropriate transition services is not thorough and well-reasoned for the following reasons:

a.  The SRO recognized that, pursuant to federal law and State regulations, "an IEP for a student who is at least 16 years of age (15 under State regulations), *or younger if determined appropriate by the CSE*, must include appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, if appropriate, independent living skills, as well as transition services needed to assist the student in reaching those goals." *SRO Dec.* 43.

b.  At the hearing, the CSE chair acknowledged that C.G.'s scores in activities of daily living (ADL) in December 2020 were very low. Although that was new information at the time of the December 2020 CSE meeting, the CSE did not

update the present levels of performance. Nor did the CSE consider the impact of concededly "very low" ADL scores on the need for transition planning.

c.  The SRO acknowledged that the June 2021 neuropsychological report documented concerns across all areas of adaptive functioning and indicated that access to transition planning supports, at that time, was critical. The neuropsychologist recommended that the IEP include goals related to transition planning and guided by C.G.'s deficits in the areas of communication, functional academics, self-direction, leisure skills, community use, and health/safety. *SRO Dec.* 43.

d.  Notwithstanding the evaluative data from the neuropsychologist, the CSE did not discuss transition planning at the September 2021 meeting. *SRO Dec.* 43. The CSE admittedly did not consider a formal transition plan for the 2021-22 school year. *SRO Dec.* 44.

e.  The June 2022 IEP had a transition plan for the 2022-23 school year. Parents presented uncontradicted testimony from an expert in transition planning that C.G.'s transition plan had none of the necessary components of an appropriate plan. Transition planning must begin with baseline data collected through age appropriate transition assessments. The District failed to take the first step necessary to create an appropriate transition plan because it never completed age appropriate transition assessments.

f.  Parents presented uncontradicted evidence from both the neuropsychologist and the transition planning expert that the 2022-23 IEP lacked services to support a post-secondary outcome of going to college.

g. Notwithstanding concededly severe weaknesses in functional adaptive life skills, the transition plan did not address independent living skills.

h. The "coordinated set of transition activities" is not specific, but rather a general description of C.G.'s existing program.

i. The SRO erroneously characterized substantively grossly inappropriate transition planning as a mere "procedural flaw." *SRO Dec.* 44. The cases relied upon by the SRO do not support the conclusion that C.G.'s plan was substantively appropriate. For example, *M.Z. v. N.Y.C. Dep't of Educ.*, 2013 U.S. Dist. LEXIS 47052, 2013 WL 1314992 (S.D.N.Y. March 21, 2013) held that "the lack of detail in the description of the transition services and the failure to identify the party responsible for those services . . . did not deny the student of FAPE when viewed in the context of the IEP as a whole." C.G.'s Parents did not just complain of a lack of detail or failure to identify a responsible party, they presented evidence that the transition planning was *substantively* inappropriate because (1) it was completely non-existent prior to June 2022 and (2) after June 2022, it was completely deficient because of the failure to conduct appropriate assessments and individualize the services to C.G.'s needs.

**COUNT I**
**IDEA**
**20 U.S.C. § 1400, *et seq.***

27. Plaintiffs repeat each paragraph above as if set forth at length herein.

28. For the reasons set forth, *supra*, the SRO decision misconstrues the record and applicable review standard and is contrary to the law.

29. Due to its erroneous decision, the SRO decision did not vindicate C.G.'s right to a FAPE and did not provide Plaintiffs with the relief to which they were entitled under the law.

**COUNT II**
**SECTION 504**
**29 U.S.C. § 794**
**ADA**
**42 U.S.C. § 12132,** *et seq.*

30. Plaintiffs repeat each paragraph above as if set forth at length herein.

31. By the actions described herein, Defendants have violated C.G.'s rights under Section 504 and the ADA.

32. By ignoring the available evaluative data in the absence of countervailing data and failing to implement the IEPs appropriately, District employees acted with deliberate or reckless indifference to C.G.'s federally protected rights and/or with bad faith or gross misjudgment.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that this Court:

(A) Assume jurisdiction of this action;

(B) Direct the New York State Department of Education, Office of State Review to produce a certified copy of the administrative record;

(C) Receive the administrative record into evidence, under seal;

(D) Receive additional evidence from Plaintiffs;

(E) Reverse the decision of the New York State of Department of Education, Office of State Review and declare that the District failed to offer C.G. a FAPE for the 2020-21, 2021-22, and 2022-23 school years;

(F) Find that the District violated C.G.'s rights under the ADA and Section 504;

(G) Award C.G. appropriate compensatory education to redress the denial of FAPE and violations of the ADA and Section 504;

(H) Declare Plaintiffs the prevailing parties in this matter;

(I) Award Plaintiffs' reasonable attorneys' fees, costs, including expert witness costs and expenses; and

(J) Award such other relief as the Court deems necessary and appropriate.

June 26, 2024                             Respectfully submitted,

Catherine Merino Reisman, Bar No. CR 7630
Reisman Carolla Gran & Zuba LLP
*Counsel for Plaintiffs*
19 Chestnut Street
Haddonfield, New Jersey 08033
856.354.0021
856.873.5640 fax
catherine@rcglawoffices.com

Gina M. DeCrescenzo, Bar No. GD 2420
Gina DeCrescenzo, P.C.
*Counsel for Plaintiffs*
180A South Broadway, Suite 100
White Plains, New York 10605
914.615.9177
914.615.9176
gina@decrescenzolaw.com

# EXHIBIT 1

THE UNIVERSITY OF THE STATE OF NEW YORK
NEW YORK STATE EDUCATION DEPARTMENT

In the Matter of the PARENTS and GUARDIANS
of  C.G.,

      Petitioners,

                           Hearing Officer:  Michael Lazan

v.

                           Case No:  566243

THREE VILLAGE CENTRAL SCHOOL DISTRICT,

      Respondent.

## FINDINGS OF FACT AND DECISION

## INTRODUCTION

This is a case involving a student who has been determined to be eligible for services as a student with autism.  A  due process complaint ("Complaint") was received by Three Village Central School District ("Respondent" or "Three Village" or "the school district") pursuant to the Individuals with Disabilities Education Act ("IDEA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504") on or about November 16, 2021 in regard to the Student.  The matter proceeded to hearings on thirteen hearing dates between  September 19, 2022 and May 25, 2023.  The names of witnesses and a description of the documents in evidence are referenced in the transcript.  Because of the extensiveness of the testimony and issues in this case, because of witness availability, to allow the parties to write briefs (IHO Exhs. 1, 2) and to allow this IHO to write this decision, multiple timelines extensions were granted here.  For each such extension, this IHO determined that the application for extension were consistent with the regulatory requirements in 8 NYCRR Sect. 200.5(j)(5)(ii) and (iii).  IHO Exhs. 3.   The FAPE claims in the

amended due process complaint are being litigated pursuant to three prehearing orders which were issued.  IHO Exhs. 4.

## **FACTS**

The Student is a 15-year-old who is currently eligible for services as a student with autism.  The Student has been diagnosed with Autism Spectrum Disorder, Level I, Specific Learning Disorder, Attention Deficit Hyperactivity Disorder ("ADHD"), Expressive Receptive Language Disorder, and Auditory Processing Disorder.  The Student has also been diagnosed with oral-motor and generalized dyspraxia, and sensory integration disorder.  R-30.

The Student is considered to be a student with "high-functioning" Autism Spectrum Disorder, but the Student struggles to make progress.  Tr. 1815.  The Student has benefitted from a small group setting and modified curriculum.  He participates in this kind of class.  The Student has had issues with inferencing and responding to an open-ended question.  Tr. 918-919.  With explicit instruction, repetition and repeated exposure, the Student is able to learn more quickly.  Tr. 919, 1827.  The Student is prone to experiencing a high degree of stress if he is not provided with appropriate supports.  Tr. 1852.

The Student's January 23, 2019 IEP meeting designated him as eligible for services as a student who is speech and language impaired.   The team recommended decreasing the Student's speech mandate to twice a week in a group, eliminating the individual sessions, but adding speech five times a week, for six minutes only, one-to-one, for articulation.  The Student was recommended for 15:1 special classes in academic subjects, with small group occupational therapy (1 x 30 minutes).  At the time, the Student's elementary school teacher felt that he needed minimal support, though the Student continued to have deficits in all speech areas.  R-1; Tr. 376-377.

A psychological evaluation was administered to the Student in October, 2019. The Student was determined to have a Full Scale IQ of 89, with a verbal comprehension index of 73, but a processing speed index of 129. A Behavior Assessment Scale for Children, Third Edition ("BASC-3") teacher scale revealed that the Student had clinically significant issues with respect to anxiety, depression, somatization, and internalizing problems. The evaluator recommended counseling, repetition, check-ins, and simplification of instructions, as well as proposed visual accommodations to help the Student learn. R-28. Speech testing in December, 2019 found that the Student's core language score on the Clinical Evaluation of Language Fundamentals-5 ("CELF-5") was 79, with particular weakness in recalling sentences, though on the Goldman Fristoe Test of Articulation-3 ("GFTA-3"), the Student's standard score was above average. R-30. Academic testing conducted in December, 2019 indicated that the Student's standard scores in reading and math on the Wechsler Intellectual Achievement Test-III ("WISC-III") were 80 (reading composite), and 76 (math composite), with a particular weakness in problem solving. R-32.

During the 2019-2020 school year, the Student attended Arrowhead Elementary School, in a program that included 15:1 classes in academic subjects. The Student made improvements in decoding through guided reading instruction. The Student was writing two paragraph essays on his own using a graphic organizer. Math was challenging to the Student, but the Student made improvements in regard to social and emotional issues. The Student was getting down on himself less. Tr. 505. For the 2019-2020 school year, the Student was reported to make satisfactory progress in most, but not all, academic goal areas prior to the onset of the COVID-19 pandemic. The Student achieved three of four speech/language goals. R-40. The Student showed good foundational skills, but was hard on himself and felt overwhelmed sometimes. The

Student also had issues with focus, attention, vocabulary, following multi-step directions, detail, fearfulness, distractions, and forgetfulness, among other things, during the school year. R-50. The Student's AIMSwebPLUS scores in reading were well below average during both tests during the 2019-2020 school year. R-49.

An IEP meeting was held for the Student on January 29, 2020 at Arrowhead School. At the time, the Student needed support with slowing down, and visual supports were important for him. Tr. 388; R-2. The Student was again recommended for 15:1 classes in academics, with speech-language therapy twice a week for thirty minutes, in a small group, speech-language therapy individual, five times weekly for six minutes, and occupational therapy, small group, 5:1, once weekly for thirty minutes. R-2.

Another IEP was written on March 13, 2020, without a meeting. Individual speech and language services were taken off of the Student's IEP entirely. Group speech was switched to alternate days (from twice a week), with a 5:1 ratio. R-3.

For the 2020-2021 school year, the Student attended Robert C. Murphy Jr. Junior High School. The start of the school year was "a little rough" and the Student missed elementary school and he often spoke about how he missed elementary school. The Student was also very hypersensitive to COVID and to germs, to masks. The Student would wipe his desk down every day when he came into the classroom, which was a little distracting for him. Eventually, the Student began to become more comfortable. Tr. 902.

Speech-language testing conducted in October, 2020 reflected low scores with respect to language development, including multiple meanings, semantics, and spoken language. On The Test of Language Development, Intermediate-Fourth Edition ("TOLD-I:4"), a comprehensive language assessment utilized to assess the Student's speech and language skills, the Student

scored in the very poor range in spoken language composite, speaking composite and semantics composite. The organizing composite and grammar composite were likewise in the poor range. The listening composite was also found to be in the below average range. The pragmatic language subtest from The Comprehensive Assessment of Spoken Language, Second Edition ("CASL-2") was administered to assess social language skills. The Student scored in the deficient range. The Student also scored in the poor range overall on the Test of Auditory Processing Skills Fourth Edition ("TAPS-4"). The GFTA-3 was given to assess the Student's speech sounds. The Student's score was in the average range, though it dropped from the previous year's score. R-37. A psychological evaluation was conducted for the Student in September and October, 2020 by an independent evaluator, Dr. Debra Reicher. The Student was determined to meet DSM-V criteria for Autism Spectrum Disorder, on the "mild end." The evaluator indicated that the Student has a significant language disorder and was struggling with anxiety. R-36.

Another IEP meeting was held on December 16, 2020. The speech and language evaluation and psychological evaluation were reviewed by the team. Petitioners sought more intensive 1:1 speech therapy. The team agreed to change the Student's eligibility classification to autism. The speech mandate was changed to small group (5:1) alternate days, for forty-two minutes, and once a week, 1:1, for forty-two minutes.

In reading, during the 2020-2021 school year, the Student was receiving services pursuant to the school district's "ALC Program," a small group instructional setting utilizing a modified NYS Regents curriculum with they worked at a slower pace. The Student's teachers saw improvement in reading comprehension. The Student's academic subject grades ranged

from 82 to 86.  R-44.   The Student's AIMSwebPLUS scores in reading were well below average during both tests during the 2020-2021 school year.  R-49.

The Student participated in an independent neuropsychological evaluation in June, 2021. The evaluator found that the Student was a friendly, cooperative boy who consistently put forth excellent effort even when task demands increased, and was eager to learn from his mistakes. Consistent with prior findings, the Student's intellectual capacity was found to be within the low average range, but he performed within age-based expectations across four of the five indices of the WISC-V.  The Student struggled across language-based tasks.  With regard to memory, the Student performed within expectations on tasks of discrete visual memory and sequential visual memory.  In language processing, the Student earned an average score on a task of expressive language skills but demonstrated consistent and significant deficits with regard to receptive language processing and supra-linguistic, or pragmatic, language processing skills. He did well on a task of cognitive flexibility, struggled significantly on a task of sustained visual attention, and demonstrated weak impulse control.  The evaluator recommended integrated school-based support to help him improve his social skills in naturalistic settings.  P-G.

The next IEP meeting was on June 8, 2021.  The school district continued to recommend 15:1 classes for the Student.  R-5.  An independent audiological and speech evaluation was conducted for the Student and reported on June 23, 2021.  On the CELF-5, the Student scored 62 in pragmatic language.  Other subtests were not given.  In expressive vocabulary, the Student's score was 51, in the first percentile.  The Student scored below average in idiomatic language and inferences, was at the first percentile in sentence expression, at the 5th percentile in grammatical morphemes, though the Student was in the average range in sentence

comprehension.   The Student could not be tested in non-literal language and drawing meaning from context.  R-38.

The next IEP meeting was on September 23, 2021.  The team reviewed the Student's neuropsychological evaluation.  The team considered increasing the Student's speech-language mandate to increase the number of individual sessions.  The committee recommended decreasing the Student's Special Class English mandate by one period to add another 1:1 speech period. Speech was increased to twice a week individually and in small group on alternative days.  R-6.

The next IEP meeting was on October 21, 2021.  The team discussed the Student's anxiety in regard to test-taking, speech, the Student's counseling mandate, and vocational instruction, among other things.  Petitioners were interested in reaching out to a job coach for the Student's future.  It was agreed that the parents should receive parent training every month.  R-7. The team discussed executive functioning and reading, and decided that the Student needed more direct  instruction in explicit reading instruction.  Goals that were written in such a way that he would have received explicit instruction in decoding and encoding.  Tr. 214.

During the 2021-2022 school year, the Student was receiving reading support through Response to Intervention ("RTI").   Dr. Peggy Place used the Wilson program, which consisted of structured lessons that allowed for whole group work and independent work.  Tr. 1363-64. The Student attended the reading group every other day.  Dr. Place would work through the Wilson program and on reading goals.  The Student was taught through explicit instruction, which is specific, organized, and scaffolded lessons that build one skill on top of another.  R-57. The Student did better when given multisensory instruction and made progress with using more complex language in writing.  Tr. 273.

The next IEP meeting was on March 31, 2022. The parents provided an audiological assessment recommending use of an FM system. The CSE agreed to try an FM system. Tr. 249-51. It was reported by Dr. Place that the Student was making progress in reading. The parents asked for an increase in speech to 1:1 speech for alternate days. The school district did not agree because the Student made progress and the Student's report card reflected grades ranging from 88 to 100. R-8. Dr. Place reported that the Student was making progress and was beginning to understand how to analyze words. The Student started at a Wilson Level 1.3 in and around November 2021, had progressed to Wilson Level 4 in and around March 2022, and had progressed to Wilson Level 5 in and around June 2022. R-57. Teachers reported that they had seen improvement in the Student's overall performance in reading. Tr. 1414. On the WADE Assessment given in June 2022, the Student showed overall improvement in reading skills compared to November 2021. Tr. 1425. Dr. Place reported that the Student ultimately achieved the IEP goal that she worked on in reading. Tr. 1411-1413. The consensus was that the Student was doing "pretty well." Tr. 258.

A psychological evaluation was conducted of the Student in June, 2022. The Student earned scores that ranged from the very low range to the high average range. Om the WISC-V, the Student obtained a Full Scale IQ of 92, in the average range of intellectual functioning, at the 30th percentile. The Student had difficulty defining a series of visually and orally presented words. The Student's special education teacher completed the Vineland Adaptive Behavior Scales-Third Edition-Comprehensive Teacher Rating ("VABS-III"). The VABS-III required C.G.'s teacher to rate how often the Student can perform certain day-to-day activities that are part of living functionally within the home, school, and community. The Student received a standard score of 60 on the Adaptive Behavior Composite, in the low range, in the first

percentile.  The evaluator said that the Student continues to demonstrate significant deficits in the areas of social communication and interaction, which deficits are  associated with individuals with a diagnosis of autism.  R-80.

The CSE met on June 16, 2022 for an annual review.  It was reported that the Student used his counseling session appropriately, and overall, the team felt that the Student adjusted to eighth grade well, though he was easily frustrated and could  become overwhelmed or anxious.  The Student struggled with retention of concepts taught and needs frequent review of materials, visual aids, outlines, checklists and organizers.  The parents continued to express concerns with the Student's reading, expressed concerns for the future, and requested an increase in reading instruction to include daily reading instruction rather than on alternating days.  R-53.  The team agreed to increase his  "multi-sensory" reading instruction from alternating day to daily.  Tr. 276, 282, 340.   This is because Dr. Place indicated that she believed that the Student's progress would not be as swift moving forward as we moved into more complicated word structures.  Dr. Place also indicated that she was working on level 6 with him at the time of the meeting, providing explicit reading instruction alternating days for 42 minutes in a group session during his reading lab class.  She indicated that the Student attended the reading class with two other students who are on similar levels.  In speech, Ms. Mulham reported the Student was making progress.  Compensatory strategies were being used, and progress was reported on using the strategies.  Progress was also reported on the use of a computer-based auditory processing program, and the Student was reported to have improved his attention to the subtle differences in sound.  Tr. 268.  The IEP continued to recommend 15:1 classes for academics, and speech services were determined to be alternate days in a group of 5:1, and twice weekly individually.

Counseling was set at twice a month.  The Student's AIMSwebPLUS scores in reading were well below average during both tests during the 2021-2022 school year.  R-49.

The Student achieved all academic goals, speech-language goals, and social-emotional-behavioral goals during the 2021-2022 year.  R-42, R-53, R-73.  The Student's report card grades were in the 85 range, though the Student failed his math final with a 60.  R-45.

During the 2022-2023 school year, the Student received daily reading support as a pull-out service with Dr. Place, using the Wilson program.  The Student was placed in a group with one other student.  The Student started the year with a 4 on the WADE assessment in September 2022.  On the November 2022 WADE assessment, the Student scored 6.3.  R-87.  At this time, the Student was reading in and around a 6th grade level.  Tr. 1447.

The next IEP meeting was held on September 23, 2022.  The team addressed issues such as the Student's safety and toileting issues, and the program was not materially changed.  A transition plan was added to this IEP.  R-62.  A speech evaluation was conducted for the Student in January, 2023.  On the TOLD-4, the Student scored in the average range in both receptive and expressive language.  On the CASL, the Student was the below average range in three subtests, and in the average range in three subtests.  The Student was in the below average range for expressive vocabulary, including expressing sentence.  R-78.

An educational evaluation was conducted of the Student in January, 2023.  On the WIAT-II, the Student scored in the average range for reading in most areas, with a weakness in oral fluency.  In math, the Student scored 70 in problem solving, in the low average range.  The Student's overall math score was in the low average range.  The Student's written expression was found to be in the average range.  R-79.

**CONCLUSIONS OF LAW**

In New York State, the burden of persuasion in special education cases is on the school district except for the second criterion in cases for tuition reimbursement or payment. NY Ed. L. 4404(1).

In <u>Endrew F. v. Douglas County School District</u>, 137 U.S. 988 (2017), the Court held that an IEP must be reasonably calculated "in light of the child's circumstances." Id. at 999-1000. The Court also held that parents can fairly expect school authorities to offer a "cogent and responsive explanation" for their decisions, and that its ruling "should not be mistaken for an invitation to the courts to substitute their own notions of sound educational policy for those of school authorities, to whose expertise and professional judgment deference should be paid." <u>Id.</u> at 1001-1002. The <u>Endrew F.</u> decision reaffirmed the Court's holding in <u>Board of Education v. Rowley</u>, 458 U.S. 176 (1982), in particular the statement that if a child is fully integrated into a regular classroom, passing marks and advancement from grade to grade through the general curriculum will ordinarily satisfy the IDEA standard. However, a footnote to the opinion warns that this "guidance should not be interpreted as an inflexible rule" and is not a holding that every child advancing from one grade to the next "is automatically receiving an appropriate education." <u>Id.</u> at 1001 n.2 (citation omitted).

**Issue # 1:** **Did the IEP(s) in effect during the 2020-2021 school year: 1) fail to sufficiently consider the Student's evaluative data; and/or 2) fail to provide the Student with an Orton-Gillingham-based reading instruction; and/or 3) fail to provide for sufficient instruction or related services in speech and language pathology, reading, social skills, transitions, executive functioning, and adaptive functioning; and/or 4) fail to provide for appropriate IEP goals; and/or 5) fail to provide for an appropriate transition plan? If so, did the school district deny the Student a FAPE?**

**Evaluative Data**

The IDEA mandates that a CSE review "existing evaluation data on the child, including (i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related service providers." 20 U.S.C. § 1414(c)(1)(A); Bd. of Educ. of Uniondale Union Free Sch. Dist. v. J.P., No. CV181038JMAAYS, 2019 WL 4315975, at *9 (E.D.N.Y. Aug. 23, 2019), report and recommendation adopted, No. 18CV1038JMAAYS, 2019 WL 4933576 (E.D.N.Y. Oct. 7, 2019). Both IDEA "and its implementing regulations require a CSE, in developing a child's IEP, to consider the most recent evaluative data of the child." L.O. v. New York City Department of Education, 822 F.3d 95 (2d Cir. 2016). L.O., 822 F.3d at 110. This requirement exists "to ensure that a CSE, in formulating a student's IEP, provides the student with services narrowly tailored to his or her educational needs based on actual and recent evaluative data." Id.

Petitioners' brief mainly points to the failure to consider evaluations for the 2021-2022 and 2022-2023 school year claims, especially the testimony of Dr. Nancy Datino, who reviewed the school district's October, 2020 speech and language evaluation and felt that evaluation did not clearly focus on the Student's needs. In particular, she felt that the evaluation did not provide the Student with a full battery of the Comprehensive Assessment of Spoken Language, Second Edition ("CASL"), which was an especially insightful test into the Student's needs. However, that evaluation was written after the commencement of the 2020-2021 school year, so the IEP team for the 2020-2021 school year, which convened in January, 2020 IEP, could not possibly have reviewed it. Moreover, the claim here is that the IEP team did not sufficiently consider the evaluative data, not that the data itself had defects. This claim is without merit.

**Orton-Gillingham**

There are no contentions in Petitioners' brief relating to the Student's need for Orton-Gillingham instruction prior to the issuance of the neuropsychological evaluation of Dr. O'Leary. As a result, this claim must be dismissed.

**Related Services, Social Skills, Executive Functioning, Adaptive Functioning, Reading**

Petitioners contended that the IEP did not provide appropriate executive functioning interventions. Dr. O'Leary recommended "integration of executive functioning supports along with daily dedicated 1:1 instruction." Petitioners contended that the Student's executive functioning supports must be daily, and that the CSE's recommendation of executive functioning through counseling twice a month for 30 minutes did not meet the Student's needs.

The recommendations of Dr. O'Leary were issued after the end of the 2020-2021 school year, and therefore could not have the basis for an IEP that was created before the start of the school year. Additionally, there is little in the record at this point to establish that the Student's adaptive skills should have been the focus of the Student's instruction, though the Student's adaptive skills were eventually determined to be in the very low range. The Student was making progress in academic subjects at this time.

Additionally, I was not convinced that the Student's reading mandate or the Student's social skills mandates were inappropriate in this IEP. Though the Student's reading was in the very low range, the Student was in a self-contained special education class for reading, and there is no clear evidence that the Student needed additional reading services at the time. The December, 2020 IEP did not mention that the parents were specifically asking for more reading services during the IEP meeting. Nor was I convinced of Petitioners' request for services for additional social skills instruction and adaptive instruction, both of which are taught by special education teachers in the self-contained setting.

But in regard to the recommendation for speech services, the conclusions must be different.  It appears that the Student's programming in speech was based in part on a decision in the 2019 IEP to replace individual speech sessions with six minute daily sessions to help the Student's articulation issues.  However, the Student was in the average range in articulation at the time.  In March, 2020, those six minute sessions were eliminated, leaving the student with only group speech, on alternate days.

There is virtually nothing in the record to clearly explain the choice to delete the Student's individual speech mandate when the Student had so many delays in speech.  On the TOLD-I:4, a language assessment utilized to assess the Student's speech and language skills, the Student scored in the very poor range in spoken language composite, speaking composite and semantics composite.  The organizing composite and grammar composite were in the poor range.  The listening composite was found to be in the below average range, with a standard score of 81.  The pragmatic language subtest from The Comprehensive Assessment of Spoken Language, Second Edition CASL-2 pragmatic language was administered to assess social language skills.  The Student scored in the deficient range.  The Student also scored in the poor range overall on the Test of Auditory Processing Skills Fourth Edition TAPS-4.

An October, 2020 speech evaluation showed that the Student still had severe deficits in speech.  Speech-language testing conducted in October, 2020 reflected low scores with respect to language development, including multiple meanings, semantics, and spoken language.  Again, on TOLD-I:4, the Student scored in the very poor range in spoken language composite, speaking composite and semantics composite, and the organizing composite and grammar composite were in the poor range.  The listening composite was found to be in the below average range, with a

standard score of 81. The pragmatic language subtest from the CASL-2 was in the deficient

range. The Student also scored in the poor range overall on the TAPS-4.

The IEP team for the meeting dated December 16, 2020 reviewed the Student's speech

evaluation as well as Dr. Reicher's psychological report, which recommended "intensive" speech

and language therapy. One individual session was then added in the December 16, 2020 IEP, as

a "compromise," but the team did not want to increase the Student's speech mandate, and the

record does not really explain why this amount was offered or how this was "intensive." Under

Endrew F., a school district must provide a "cogent and responsive explanation" for their

decisions, especially since, in this context, during which the Student was also experiencing

considerable difficulties associated with the pandemic and with the transition to junior high

school. It is noted that the Student probably did not receive some of his individual speech

sessions during the year anyway because of the pandemic. The Student received "asynchronous

and synchronous" speech instruction through the Google classroom and with some direct

instruction during the pandemic. The school district denied the Student a FAPE by failing to

provide the Student with a sufficient mandate of speech therapy during the 2020-2021 school

year.

**Goals/Transition**

Petitioners contended that the Student's IEP lacked goals relating to the Student's

transition needs. The IDEA provides that "beginning not later than the first IEP to be in effect

when the child is 15," an IEP must include "postsecondary goals based upon age appropriate

transition assessments related to training, education, employment, and, where appropriate,

independent living skills" and "the transition services (including courses of study) needed to

assist the child in reaching those goals." 20 U.S.C. Sect. 1414(d)(1)(A)(i)(VIII)(aa)-(bb); 8

NYCRR Sect. 200.4(d)(2)(ix). This includes a statement of the Student's needs as they relate to post-school activities, measurable annual postsecondary goals, a statement of transition service needs, needed activities to facilitate transition to post-school activities and a statement of the responsibilities of the school district and/or, when applicable, participating agencies. 8 NYCRR Sect. 200.4(d)(2)(ix) (1)-(5).

The act allows IEP teams to begin transition services earlier. 34 C.F.R. Sect. 300.320 (b); 71 Fed. Reg. 46,667 (2006). If an IEP team elects to begin transition planning before it is required, the standards outlined in the IDEA still apply. "Questions and Answers on Individualized Education Programs (IEPs), Evaluations, and Reevaluations," 111 LRP 63322 (OSERS September 1, 2011). However, in this case, the school district did *not* so elect. It therefore had no duty to provide this Student with a transition plan. This claim is without merit.

Nevertheless, I find that the school district denied the Student a FAPE during the 2020-2021 school year by failing to provide appropriate speech-language services.

**Issue# 2:** **Did the IEP(s) in effect during the 2021-2022 school year: 1) fail to consider the Student's neuropsychological evaluation and private speech evaluation; and/or 2) fail to provide the Student with an Orton-Gillingham-based reading program; and/or 3) fail to provide the Student with appropriate IEP goals that are measurable to address the Student's needs; and/or 4) fail to provide for an appropriate transition plan; and/or 5) failed to provide appropriate related services in the areas of reading, speech/language, executive functioning skills, social skills and adaptive daily living. If so, did the school district deny the Student a FAPE?**

**Evaluations**

If a parent obtains an IEE at public expense or shares an evaluation obtained at private expense, the district must consider those results when making decisions involving the provision of FAPE to the child (provided that the IEE meets district criteria). 34 C.F.R. Sect. 300.502(c)(1). While a district must consider the results of an IEE, it has no obligation to adopt the evaluator's recommendations or conclusions. T.S. v. Bd. of Educ. of Town of Ridgefield, 10

F.3d 87 (2d Cir. 1993) (rejecting the parent's argument that the district failed to adequately consider the IEE and finding that the district's review of the report satisfied the student's rights under the IDEA).

Here, there is no contention that the school district did not consider the neuropsychological evaluation of Dr. O'Leary and the speech evaluation of Dr. Datino. The contention here is effectively that the school district should have agreed with the evaluators, which is not a requirement under the IDEA. This claim should be dismissed.

**Orton-Gillingham/Reading**

The neuropsychological evaluation recommended access to daily reading/spelling remediation using Orton-Gillingham program. Petitioners therefore contended that, to receive educational benefit, the Student needed evidence-based academic instruction, including daily reading instruction "implemented with integrity." Petitioners contended that the reading program for the Student during the 2021-2022 school year was inadequate, pointing out that Dr. Place only had some training in Orton-Gillingham, that the Wilson program implemented by Dr. Place including grouping the Student with other students that were below the Student in terms of progress, that Dr. Place used materials outside the scope and sequence of Wilson, that Dr. Place started instruction without the baseline testing, that Wilson, taught with fidelity, requires enough time to complete two full lessons a week, and related concerns.

Respondent stressed that the Student did begin receiving Orton-Gillingham instruction through the Response to Intervention ("RTI") program. Respondent indicated that the Student began receiving support through the RTI program in and around November 2021, which was multisensory reading instruction using the Wilson program. The Wilson program is based on the Orton-Gillingham methodology. Dr. Place reported that the Student made progress in this program. Dr. Place would not only work through the Wilson program but would also work on

reading goals. The Student was taught through explicit instruction, which is specific, organized, and scaffolded lessons that build one skill on top of another. The Student started at a Level 1.3 in and around November 2021, had progressed to Level 4 in and around March 2022, and had progressed to Level 5 in and around June 2022. The Student also received reading instruction as part of the District's "ALC" program, which is a small group instructional setting using a modified NYS Regents curriculum, working at a slower pace, including a support period.

Moreover, in general, a CSE is not required to specify methodology on an IEP, and the precise teaching methodology to be used by a student's teacher is usually a matter to be left to the teacher's discretion, absent evidence that a specific methodology is necessary. Rowley, 458 U.S. at 204; R.B. v. New York City Dep't of Educ., 689 F. App'x 48 (2d Cir. 2017); A.S. v. New York City Dep't of Educ., 573 Fed. App'x 63, 66 (2d Cir. 2014). Still, there are circumstances where the use of a specific methodology or program is required for a student to receive an educational benefit. A.S., 573 Fed. App'x at 66 (it could not "be said that [the student] could only progress in an ABA program").

Under the circumstances, Petitioners' assertions about the inappropriateness of Dr. Place's work with the Student have been sufficiently rebutted by the school district.[1]

**Related Services, Social Skills, Executive Functioning, Adaptive Functioning**

---

[1] Respondent argued that the Wilson AIS services delivered by Dr. Place can be characterized as "specially designed instruction." "Specially designed reading instruction" is specially designed individual or group instruction or special services or programs in the area of reading. 8 NYCRR §200.6(b)(6). The caselaw does suggest that AIS services can be considered specially designed instruction. Bd. of Educ. of Uniondale Union Free Sch. Dist. v. J.P., No. CV181038JMAAYS, 2019 WL 4315975, at *12 (E.D.N.Y. Aug. 23, 2019), report and recommendation adopted, No. 18CV1038JMAAYS, 2019 WL 4933576 (E.D.N.Y. Oct. 7, 2019). However, the caselaw also indicated that, if AIS services are considered specially designed instruction, they should be included on the Student's IEP. There is no dispute that AIS services were not included on the Student's IEP. However, there is no evidence that the failure to add AIS services to the IEP was a material error. Indeed, this is not a claim that Petitioners raised. Petitioners instead raised concerns about the nature of the services that were delivered to the Student, including questioning the competency of the service provider and arguing that the reading program was not implemented with fidelity.

Petitioners contended that the IEP did not provide appropriate executive functioning interventions. Dr. O'Leary recommended "integration of executive functioning supports along with daily dedicated 1:1 instruction." He also appeared to be seeking skills-based instruction for social skills and for adaptive skills. Petitioners contended that the Student's executive functioning supports must be daily, and that the CSE's recommendation of executive functioning through counseling twice a month for 30 minutes did not meet the Student's needs.

Dr. O'Leary explained that his recommendation was derived from the gap between the Student's robust performance on the Wisconsin Card Sorting Task and his functional executive functioning abilities. He said that the Student struggles on a daily basis to plan and organize. He said that this needed to be addressed through direct, daily explicit instruction on generalizing executive functioning tasks. He explained that it had to be daily, underscoring the importance of learning life skills generally and the Student's need for repetition. He said that the recommendation from the CSE to provide executive functioning support in a counseling session two times a month for 30 minutes each was "not even gonna make a dent." He said that there are different certificate programs for executive functioning coaching.

But Dr. O'Leary's testimony was based on speculation, not on how the Student was actually performing in the classroom. There were no reports of the Student experiencing such severe executive functioning issues (or social or adaptive functioning issues) that he could not participate in the general curriculum. To the contrary, the Student performed well in his report cards and frequently achieved his IEP goals. The March, 2022 IEP reported that the Student was "delightful" in reading. In Study Skills, it was reported that the Student comes to class eager to work. There were reports that the Student was also doing well in general education family and consumer science classes. As pointed out by Michelle Verga, the Student was able to "keep up

with his work." Moreover, Dr. O'Leary does not consider that the Student's special education teachers would also provide the Student with assistance with executive functioning, adaptive functioning, and in other areas. Dr. O'Leary testified that part of any educator's education is learning about executive functioning, that any classroom teacher, any special educator, has an understanding of the "intersection between executive functioning and academic tasks and the tasks that are required to do homework, organize a backpack, organize a paragraph, those types of things."

The Student's speech mandate for the 2021-2022 school year was for group speech on alternate days and two sessions of individual speech. Dr. Datino felt that this was still not enough. She testified that she felt that the Student had a significant communication disorder secondary to autism and that he had specific needs they were delaying him from achieving his academic goals. She felt that the speech-language pathologist should be the key player for the Student in the classroom, to "kind of take the reins" and develop the specific skills-targeted intervention that the Student "really required to perform in the classroom." She said that research shows that frequent intense intervention leads to much better outcomes. She said it is critical that the Student have that one person to maybe preview, review, check in with on a daily basis. She said that the Student is a worker, that the Student wants the work, and that his language skills are exceptionally weak.

I was not convinced by Dr. Datino's premise that the Student's language is "exceptionally weak" and that he needs to be pulled from his 15:1 academic classes and placed in a different setting entirely. The reports from the Student's classroom teachers have been uniformly positive. None have suggested that the Student needs a new academic classroom setup. The Student's speech therapist, Ms. Mulham, reported that the Student had a "great year"

through the mandate, which called for speech therapy for five out of six days.  The Student

achieved all of his speech goals during the 2021-2022 school year.  I find that the Student's

speech mandate was sufficient to pass muster under the IDEA.

**Goals/Transition**

At the end of the 2021-2022 school year, the Student had not turned fifteen years, and no

transition services were included on the Student's IEP.  This claim must be dismissed.

In sum, I find that the school district provided the Student with a FAPE during the 2021-

2022 school year.

**Issue #3.** **Did the IEP(s) in effect during the 2022-2023 school year: 1) fail to consider the Student's neuropsychological evaluation and private speech evaluation; and/or 2) fail to provide the Student with an Orton-Gillingham-based reading program; and/or 3) fail to provide the Student with appropriate IEP goals that are measurable to address the Student's needs; and/or 4) fail to provide for an appropriate transition plan; and/or 5) failed to provide appropriate related services in the areas of reading, speech/language, executive functioning skills, social skills and adaptive daily living? If so, did the school district deny the Student a FAPE?**

**Evaluations**

This claim was addressed in the section discussing Issue #2.   The school district clearly

reviewed the parent's neuropsychological evaluation and speech evaluation during the 2021-

2022 school year.  This claim lacks merit.

**Orton-Gillingham/Reading**

For the same reasons discussed in the section discussing Issue #2, earlier, the Student's

reading program for the 2022-2023 school year appropriate.  The record indicated that the

Student made meaningful gains during the 2021-2022 school year as a function of the instruction

by Dr. Place.  The parents continued to express concerns with the Student's reading, expressed

concerns for the future, and requested an increase in reading instruction to include daily reading

instruction rather than on alternating days.  But Dr. Place indicated that the Student began his

instruction on Wilson level 1.3 in November 2021, and was able to master the skills required in levels 2 and 3. She was working on level 6 with him at the time of the IEP meeting, providing explicit reading instruction alternating days for 42 minutes in a group session during his reading lab class. Moreover, the school district agreed to increase his "multi-sensory" reading instruction from alternating day to daily because Dr. Place indicated that she believed that the Student's progress would not be as swift moving forward as we moved into more complicated word structures. This claim is without merit.

**Related Services, Social Skills, Executive Functioning, Adaptive Functioning**

In speech, Ms. Mulham reported the Student was making progress. Compensatory strategies were being used, and progress was reported on using the strategies. Progress was also reported on the use of a computer-based auditory processing program, and the Student was reported to have improved his attention to the subtle differences in sound. The Student's IEP progress reports for the 2021-2022 school year indicated that the Student achieved every goal in every area. The Student achieved all speech-language goals during the 2021-2022 year.

Moreover, the Student's report card grades were in the 85 range, and the Student achieved all of his academic goals. It was also reported that the Student used his counseling sessions appropriately. As with the program for the 2021-2022 school year, there was no need to add services relating to adaptive functioning, executive functioning, or social skills, especially since this kind of instruction is taught by special education teachers in the self-contained setting, where the Student has been doing well.

**Goals/Transition**

The Student turned fifteen on June 17, 2023, at or about the end of the 2022-2023 school year. The June, 2023 IEP therefore contained a transition plan. Petitioners contended that the

Student's evaluations indicated a severe weakness in functional adaptive life skills, and that the

transition plan did not address independent living skills. Petitioners also contended that the

coordinated set of transition activities is not specific, but rather a general description of the

Student's existing program. Petitioners also contended that the reference to community

experiences in the plan is unclear, that the plan says that the Student will attend a four year

college without mentioning his need for support, that the employment goal is a generic statement

that is not measurable, and that a skills or interests inventory was not completed. Petitioners also

contended that transportation-related concerns were not properly addressed in the plan.

The plan does address several issues relating to the Student's transition out of school. It

mentions that the Student will the library to research events and activities in the community that

support his interests. At the time, the Student was unsure what type of job he would be

interested in. It was recommended that the Student should utilize the "Self-Discovery" option

through his Naviance account and complete "The Career Interest Profiler" which captures

interests to help identify personality traits and suggests careers based on the U.S. Department of

Labor's data. It also indicated that the Student work to independently transport himself (by car

or public transportation).

While the transition plan may not have been especially superior, there is no evidence that

this plan deprived the Student of a FAPE or affected the Student's education or future materially.

Even after a student turns fifteen, courts generally hold that defective transition plans are

procedural violations that do not deny FAPE unless they result in a substantial deprivation of a

student's or parents' rights. R.B., 689 F. App'x 48 (without deciding whether a New York district

violated the IDEA by failing to assess the postsecondary transition needs of a teenager with

autism, the 2d U.S. Circuit Court of Appeals held that alleged procedural error did not result in a

denial of FAPE);  M.M. v. New York City Dep't of Educ., 655 F. App'x 868 (2d Cir. 2016)(given

that the IEP developed for an 18-year-old with autism discussed the student's vocational program

and included annual goals, the Second Circuit ruled that the district's failure to document certain

details about the student's postsecondary transition services was harmless.).

In sum, I find that the school district offered the Student a FAPE for the 2022-2023

school year.

## SECTION 504 AND ADA CLAIMS

With respect to the claims pursuant to the Section 504 of the Rehabilitation Act of 1973,

Petitioners contended that the District did not provide appropriate "research-based services."  I

have no jurisdiction to make decisions on ADA claims, which must be dismissed.

The statutory purpose of Section 504 of the Rehabilitation Act of 1973 is like that of

IDEA.  Muller ex rel. Muller v. Comm. on Special Educ. of the E. Islip Union Free Sch. Dist.,

145 F.3d 95, 100 n. 2 (2d. Cir.1998).  The Rehabilitation Act provides that "no otherwise

qualified individual with a disability in the United States ... shall, solely by reason of her or his

disability, be excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C.

Sect. 794(a).  The definition of "individual with a disability' under Section 504 is broader in

certain respects than the definition of a child with a disability under the IDEA, although students

who receive services under the IDEA do not automatically qualify as individuals with disabilities

under Section 504.  B.C. v. Mount Vernon Sch. Dist., 837 F.3d 152 (2d Cir. 2016).

Courts have held that there appears to be few differences, if any, between IDEA's

affirmative duty and Section 504's negative prohibition.  W.B. v. Matula, 67 F.2d 484 (3d Cir.

1995), abrogated on other grounds by, <u>A.W. v. Jersey City Pub. Schs.</u>, 47 IDELR 282 (3d Cir.

2007)("there appears to be few differences, if any, between IDEA's affirmative duty and

Section 504's negative prohibition.").   I have not found that the school district denied the

Student a FAPE because it did not provide appropriate research-based services.   I am similarly

unpersuaded that the school district violated Section 504.   This claim is dismissed.

### **RELIEF**

Petitioners seek a wide range of relief, but the only relief that corresponds to the FAPE

deprivation in this case is the request for compensatory speech services.  I have not found that

the school district denied the Student a FAPE because of a lack of a transition plan, assistive

technology evaluation, class size, executive functioning supports, and a daily dedicated period to

work 1:1 with an educator to learn compensatory strategies, differentiation of curriculum, access

to peers with a similar profile, daily reading/spelling/remediation using Orton-Gillingham

programming.

Where Districts have failed to offer students a FAPE, courts have wide discretion to

ensure that students receive a FAPE going forward.  As the Supreme Court has stated: The

statute directs the court to "grant such relief as [it] determines is appropriate."  The ordinary

meaning of these words confers broad discretion on the court because the type of relief is not

further specified, except that it must be "appropriate." <u>School Committee of the Town of</u>

<u>Burlington v. Dep't of Education, Massachusetts</u>, 471 U.S. 359, 371 (1985).

Compensatory education is an available option under the Act to make up for denial of a

free and appropriate public education.  While the Circuit has previously enunciated a "gross

violation" standard in this connection, <u>Garro v. State of Connecticut</u>, 23 F.3d 734, 737 (2d Cir.

1994), this standard is at odds with the standards in most jurisdictions and has not been applied

in recent decisions issued by the Second Circuit.  <u>Doe v. E. Lyme Bd. of Educ.</u>, 790 F.3d 440,

456 (2d Cir. 2015). In P. v. Newington Bd. of Educ., 546 F.3d 111 n.13 (2d Cir. 2008), the

Circuit signaled that the Garro approach is only applicable where Students are over 21. In

analyzing this issue, the court referenced the seminal compensatory education case of Reid v.

District of Columbia, 401 F.3d 516, 518 (D.C. Cir. 2005). In Reid, the D.C. Circuit explained

that compensatory education should be fashioned without a "cookie cutter approach" and that

compensatory education must be reasonably calculated to provide the educational benefits that

likely would have accrued from special education services the school district should have

supplied in the first place. Id., 401 F. 3d at 524; Friendship Edison Public Charter School v.

Nesbitt, 532 F. Supp. 2d 121, 125 (D.D.C. 2008) (compensatory award must be based on a

qualitative, fact-intensive inquiry used to craft an award tailored to the unique needs of the

disabled student); Application of a Student with a Disability, Appeal No. 14-172 (reducing a

quantitatively determined award of additional services based upon evidence in the hearing record

demonstrating that the student received some special education services and received some

degree of benefit therefrom).

Petitioners requested 100.8 hours of compensatory speech therapy as relief for the FAPE

speech-related deprivation for the 2021-2022 school year. While I did not find that Respondent

denied the Student a FAPE during the 2021-2022 school year, the FAPE deprivation that I did

find for the 2020-2021 school year also related to speech. I therefore find it appropriate to use

the 100.8 figure to calculate a compensatory education amount corresponding to the FAPE

deprivation for the 2020-2021 school year.

## **ORDER**

As a result of the foregoing:

1.    The Student is hereby awarded 100.8 hours of compensatory speech and language tutoring, to be provided by an independent speech therapist with at least ten years of experience working with students with autism, at a reasonable and customary rate in the community;

2.    All other claims and requests for relief are denied.

Dated: November 13, 2023
ACRD: November 13, 2023

*Michael Lazan*
Hearing Officer

## NOTICE OF RIGHT TO APPEAL

Within 40 days of the date of this decision, the parent and/or the Public-School District has a right to appeal the decision to a State Review Officer (SRO) of the New York State Education Department under section 4404 of the Education Law and the Individuals with Disabilities Education Act.  If either party plans to appeal the decision, a notice of intention to seek review shall be personally served upon the opposing party no later than 25 days after the date of the decision sought to be reviewed.  An appealing party's request for review shall be personally served upon the opposing party within 40 days from the date of the decision sought to be reviewed. An appealing party shall file the notice of intention to seek review, notice of request for review, request for review, and proof of service with the Office of State Review of the State Education Department within two days after service of the request for review is complete. The rules of procedure for appeals before an SRO are found in Part 279 of the Regulations of the Commissioner of Education. A copy of the rules in Part 279 and model forms are available at http://www.sro.nysed.gov.

# EXHIBIT 2



# The University of the State of New York

## The State Education Department
### State Review Officer
#### www.sro.nysed.gov

No. 23-309

Application of a **STUDENT WITH A DISABILITY**, by his parents, for review of a determination of a hearing officer relating to the provision of educational services by the Board of Education of the Three Village Central School District

**Appearances:**

Gina DeCrescenzo, PC, attorneys for petitioners, by Gina DeCrescenzo, Esq.

Guercio & Guercio, LLP, attorneys for respondent, by Rachel N. Roth, Esq.

## DECISION

### I. Introduction

This proceeding arises under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) and Article 89 of the New York State Education Law. Petitioners (the parents) appeal from a decision of an impartial hearing officer (IHO) which determined that the educational program and services respondent's (the district's) Committee on Special Education (CSE) had recommended for their son for the 2021-22 and 2022-23 school years were appropriate. The district cross-appeals from that portion of the IHO's decision which found that it's CSEs failed to recommend appropriate services for the student for the 2020-21 school year and awarded compensatory education. The appeal must be dismissed. The cross-appeal must be sustained.

### II. Overview—Administrative Procedures

When a student in New York is eligible for special education services, the IDEA calls for the creation of an individualized education program (IEP), which is delegated to a local Committee on Special Education (CSE) that includes, but is not limited to, parents, teachers, a school psychologist, and a district representative (Educ. Law § 4402; see 20 U.S.C. § 1414[d][1][A]-[B]; 34 CFR 300.320, 300.321; 8 NYCRR 200.3, 200.4[d][2]). If disputes occur between parents and school districts, incorporated among the procedural protections is the opportunity to engage in mediation, present State complaints, and initiate an impartial due process hearing (20 U.S.C.

§§ 1221e-3, 1415[e]-[f]; Educ. Law § 4404[1]; 34 CFR 300.151-300.152, 300.506, 300.511; 8 NYCRR 200.5[h]-[*l*]).

New York State has implemented a two-tiered system of administrative review to address disputed matters between parents and school districts regarding "any matter relating to the identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student" (8 NYCRR 200.5[i][1]; see 20 U.S.C. § 1415[b][6]-[7]; 34 CFR 300.503[a][1]-[2], 300.507[a][1]). First, after an opportunity to engage in a resolution process, the parties appear at an impartial hearing conducted at the local level before an IHO (Educ. Law § 4404[1][a]; 8 NYCRR 200.5[j]). An IHO typically conducts a trial-type hearing regarding the matters in dispute in which the parties have the right to be accompanied and advised by counsel and certain other individuals with special knowledge or training; present evidence and confront, cross-examine, and compel the attendance of witnesses; prohibit the introduction of any evidence at the hearing that has not been disclosed five business days before the hearing; and obtain a verbatim record of the proceeding (20 U.S.C. § 1415[f][2][A], [h][1]-[3]; 34 CFR 300.512[a][1]-[4]; 8 NYCRR 200.5[j][3][v], [vii], [xii]). The IHO must render and transmit a final written decision in the matter to the parties not later than 45 days after the expiration period or adjusted period for the resolution process (34 CFR 300.510[b][2], [c], 300.515[a]; 8 NYCRR 200.5[j][5]). A party may seek a specific extension of time of the 45-day timeline, which the IHO may grant in accordance with State and federal regulations (34 CFR 300.515[c]; 8 NYCRR 200.5[j][5]). The decision of the IHO is binding upon both parties unless appealed (Educ. Law § 4404[1]).

A party aggrieved by the decision of an IHO may subsequently appeal to a State Review Officer (SRO) (Educ. Law § 4404[2]; see 20 U.S.C. § 1415[g][1]; 34 CFR 300.514[b][1]; 8 NYCRR 200.5[k]). The appealing party or parties must identify the findings, conclusions, and orders of the IHO with which they disagree and indicate the relief that they would like the SRO to grant (8 NYCRR 279.4). The opposing party is entitled to respond to an appeal or cross-appeal in an answer (8 NYCRR 279.5). The SRO conducts an impartial review of the IHO's findings, conclusions, and decision and is required to examine the entire hearing record; ensure that the procedures at the hearing were consistent with the requirements of due process; seek additional evidence if necessary; and render an independent decision based upon the hearing record (34 CFR 300.514[b][2]; 8 NYCRR 279.12[a]). The SRO must ensure that a final decision is reached in the review and that a copy of the decision is mailed to each of the parties not later than 30 days after the receipt of a request for a review, except that a party may seek a specific extension of time of the 30-day timeline, which the SRO may grant in accordance with State and federal regulations (34 CFR 300.515[b], [c]; 8 NYCRR 200.5[k][2]).

### III. Facts and Procedural History

The parties' familiarity with this matter is presumed and, therefore, the facts and procedural history of the case and the IHO's decision will not be recited here in detail. At issue in this matter is the student's special education programming for the 2020-21 (seventh grade) through 2022-23 (ninth grade) school years, for which IEPs were developed on January 29, 2020, March 13, 2020, and December 16, 2020 (2020-21 school year); June 8, 2021, September 23, 2021, October 21, 2021, and March 31, 2022 (2021-22 school year); and June 16, 2022, and September 13, 2022

(2022-23 school year) (see generally Dist. Exs. 2-8; 53; 58; 62).[1]  For all school years at issue the student attended the district programming recommended in the IEPs (see generally Dist. Exs. 41-42; 44-45; 55-56; 64-65; 67).

## A. Due Process Complaint Notice

In an amended due process complaint notice dated July 21, 2022, the parents alleged that the district failed to offer the student a free appropriate public education (FAPE) for the 2020-21, 2021-22, and 2022-23 school years (see Parent Ex. A at p. 2).[2, 3]  For all three school years, the parents alleged that the district deprived them of the right to meaningfully participate in the CSE process and that the CSEs failed to appropriately consider evaluative information; failed to develop measurable annual goals and did not develop annual goals in all areas of needs; failed to recommend a program and services or methodologies and strategies based on peer-reviewed research; failed to recommend related services consistent with the evaluative information; failed to recommend sufficient special education, supports, or related services to address the student's social skills, executive functioning skills, or adaptive functioning and activities of daily living skills, or to enable the student to make progress; and failed to recommend an appropriate transition plan (id. at pp. 13-15).  For relief, the parents requested that the district be required to develop an IEP with specific recommendations consistent with evaluative information, as well as compensatory education in an amount to be determined at the hearing (id. at p. 16).

## B. Impartial Hearing Officer Decision

After prehearing conferences held on April 14 and April 28, 2022 (Apr. 14, 2022 Tr. pp. 1-31; Apr. 28, 2022 Tr. pp. 1-22),[4] an impartial hearing convened on September 19, 2022 and concluded on May 25, 2023 after 13 hearing dates (Tr. pp. 1-2000).  In a decision dated November 13, 2023, the IHO found that the district failed to offer the student a FAPE for the 2020-21 school year but offered the student a FAPE for the 2021-22 and 2022-23 school years (see IHO Decision at pp. 12-24).[5]

---

[1] The hearing record contains multiple duplicative exhibits.  For purposes of this decision, only district exhibits are cited in instances where both a parent and district exhibit are identical in content.  The IHO is reminded that it is his responsibility to exclude evidence that he determines to be irrelevant, immaterial, unreliable, or unduly repetitious (see 8 NYCRR 200.5[j][3][xii][c]).

[2] The original due process complaint notice was dated November 11, 2021 (see Due Process Compl. Not.).

[3] The parents also alleged violations of section 504 of the Rehabilitation Act of 1973 (section 504) (29 U.S.C. § 794[a]), and the Americans with Disabilities Act (ADA) (42 U.S.C. § 12101 et seq.) (see Parent Ex. A at pp. 1, 15).

[4] The transcripts of the prehearing conferences were not consecutively paginated with the transcripts for the impartial hearing; therefore, for purposes of this decision, the cites to the transcripts of the prehearing conferences will be preceded by the hearing date.

[5] The IHO found he had no jurisdiction over claims falling under the ADA and that the district did not violate section 504 (see IHO Decision at pp. 24-25).

With respect to the 2020-21 school year, the IHO found that the CSEs had before them sufficient evaluative information; that the CSEs did not have information before them regarding the student's need for Orton-Gillingham instruction or supports for executive functioning; that the recommendations for a special class met the student's reading, social skills, and adaptive functioning needs; and that the district was not required to provide the student with a transition plan at that time (see IHO Decision at pp. 12-13, 15-16). However, the IHO found that recommendation in the March 2020 IEP for the student to receive group speech-language therapy on alternate days with no individual speech-language therapy was not appropriate given that the student "had so many delays in speech" (id. at pp. 14-15). Further, the IHO determined that the district did not offer a sufficient explanation regarding the appropriateness of the December 2020 CSE's addition of one individual speech-language therapy session per week in light of the recommendation in a psychological report for "intensive" speech-language therapy and information about the student's struggles associated with the COVID-19 pandemic and his transition to a district junior high school (id. at p. 15).

Turning to the 2021-22 school year, the IHO found that the CSEs were not required to adopt recommendations set forth in parents' privately obtained evaluations; that the CSEs were not required to specify a specific instructional methodology on the student's IEPs but that, in any event, the student received specialized reading instruction during the 2021-22 school year; that information before the CSE from the student's classroom teachers reflected that the student did not require the intensive executive functioning and adaptive functioning supports and a different setting for speech-language needs as recommended by the private evaluator and that, instead, the recommendations for a special class, counseling, and individual and group speech-language therapy were designed to meet those needs; and that the district was not required to provide the student with a transition plan at that time (see IHO Decision at pp. 16-21).

For the 2022-23 school year, the IHO determined that, as with the 2021-22 school year, the evidence showed that the CSEs considered the parents' privately obtained evaluations; that, during the 2021-22 school year, the student had made gains in reading and speech-language therapy, was using counseling sessions, achieved annual goals and passing marks on his report cards, and as a result, the IHO found that the recommendation for similar programming for the 2022-23 school year was appropriate, the CSEs were not required to add services related to adaptive functioning, executive functioning, or social skills, and the transition plan included in the June 2022 IEP, while not "especially superior," did not deprive the student of a FAPE (IHO Decision at pp. 21-24).

For relief, the IHO ordered the district to provide the student with 100.8 hours of compensatory speech-language therapy to remedy the district's failure to offer or provide the student with a FAPE for the 2020-21 school year (see IHO Decision at pp. 25-27). The IHO denied the remaining relief sought by the parents (id. at p. 27).

## IV. Appeal for State-Level Review

The parents appeal and the district cross-appeals from the IHO's decision. The parties' familiarity with the particular issues for review on appeal in the parents' request for review and the district's answer with cross-appeal is also presumed and, therefore, the allegations and arguments will not be recited here in detail.

Briefly, the parents allege that the IHO erred in finding that the district offered the student a FAPE for the 2021-22 and 2022-23 school year and erred by not finding additional grounds to determine that the district denied the student a FAPE for the 2020-21 school year.[6] For all three school years, the parents allege error in the IHO's findings pertaining to the CSEs' consideration of evaluations; recommendations to address the student's reading, executive functioning, and/or adaptive skills; and failure to develop a transition plans or an appropriate transition plan. Specific to the 2021-22 and 2022-23 school years, the parents appeal the IHO's findings that the CSEs recommended sufficient supports and services to address the student's speech-language and auditory processing needs. The parents also allege that the IHO failed to address their claim that the district's actions impeded their ability to participate in the decision-making process. For relief, the parents request that the district fund independent educational evaluations (IEEs) of the student relating to transition planning and assistive technology and to develop an IEP prospectively recommending specific programming and services. The parents also request compensatory educational services for all three school years, consisting of 176.4 hours of speech-language therapy services in addition to the services awarded by the IHO, 270 hours of Orton-Gillingham reading instruction, and 180 hours of executive functioning instruction.

In its answer with cross-appeal, the district responds to the parents' material allegations with general admissions and denials and argues that, with the exception of the findings challenged in its cross-appeal, the IHO's decision should be affirmed.[7] As for its cross-appeal, the district alleges that the IHO erred in finding that the district failed to offer the student appropriate speech-language therapy services and, therefore, denied the student a FAPE for the 2020-21 school year and by ordering compensatory speech-language therapy as relief for that violation.

The parents submit a reply and an answer to the cross-appeal. The district submits a reply to the parents' answer to the cross-appeal.

## V. Applicable Standards

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services

---

[6] The parents also allege that the IHO erred in finding no violation of section 504. However, an SRO lacks jurisdiction to consider a parent's challenge to an IHO's decision regarding section 504, as an SRO's jurisdiction is limited by State law to matters arising under the IDEA and Article 89 of the Education Law (Educ. Law § 4404[2] [providing that SROs review IHO determinations "relating to the determination of the nature of a child's handicapping condition, selection of an appropriate special education program or service and the failure to provide such program"]). Courts have also recognized that the Education Law makes no provision for State-level administrative review of IHO decisions with regard to section 504 (see A.M. v. New York City Dep't of Educ., 840 F. Supp. 2d 660, 672 & n.17 [E.D.N.Y. 2012] [noting that "[u]nder New York State education law, the SRO's jurisdiction is limited to matters arising under the IDEA or its state counterpart"], aff'd, 513 Fed. App'x 95 [2d Cir. 2013]; see also F.C. v. New York City Dep't of Educ., 2016 WL 8716232, at *11 [S.D.N.Y. Aug. 5, 2016]). Therefore, an SRO does not have jurisdiction to review any portion of the parent's claims regarding section 504, and accordingly such claims will not be further addressed.

[7] The district's answer and cross-appeal includes several generic defenses, broadly stated, alleging that the parents' request for review is noncompliant with State regulations or otherwise insufficient. I will not address the district's defenses as the arguments are not particularized and include no citations to the parents' request for review or the hearing record.

designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 239 [2009]; Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206-07 [1982]).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; T.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 151, 160 [2d Cir. 2014]; R.E. v. New York City Dep't of Educ., 694 F.3d 167, 189-90 [2d Cir. 2012]; M.H. v. New York City Dep't of Educ., 685 F.3d 217, 245 [2d Cir. 2012]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). "'[A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP'" (Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 [2d Cir. 1998], quoting Rowley, 458 U.S. at 206; see T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 253 [2d Cir. 2009]). The Supreme Court has indicated that "[t]he IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement" (Endrew F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. 386, 399 [2017]). While the Second Circuit has emphasized that school districts must comply with the checklist of procedures for developing a student's IEP and indicated that "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not" (R.E., 694 F.3d at 190-91), the Court has also explained that not all procedural errors render an IEP legally inadequate under the IDEA (M.H., 685 F.3d at 245; A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 172 [2d Cir. 2009]; Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]). Under the IDEA, if procedural violations are alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 525-26 [2007]; R.E., 694 F.3d at 190; M.H., 685 F.3d at 245).

The IDEA directs that, in general, an IHO's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak, 142 F.3d at 130; see Rowley, 458 U.S. at 189). "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created" (Endrew F., 580 U.S. at 404). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere

6

'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see T.P., 554 F.3d at 254; P. v. Newington Bd. of Educ., 546 F.3d 111, 118-19 [2d Cir. 2008]). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Endrew F., 580 U.S. at 403 [holding that the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances"]; Rowley, 458 U.S. at 192). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; see Newington, 546 F.3d at 114; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 [2d Cir. 2007]; Walczak, 142 F.3d at 132).

An appropriate educational program begins with an IEP that includes a statement of the student's present levels of academic achievement and functional performance (see 34 CFR 300.320[a][1]; 8 NYCRR 200.4[d][2][i]), establishes annual goals designed to meet the student's needs resulting from the student's disability and enable him or her to make progress in the general education curriculum (see 34 CFR 300.320[a][2][i], [2][i][A]; 8 NYCRR 200.4[d][2][iii]), and provides for the use of appropriate special education services (see 34 CFR 300.320[a][4]; 8 NYCRR 200.4[d][2][v]).[8]

The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see R.E., 694 F.3d at 184-85).

## VI. Discussion

### A. 2020-21 School Year (January 2020, March 2020, and December 2020 IEPs)

Initially, it is well settled that a student's progress under a prior IEP is a relevant area of inquiry for purposes of determining whether an IEP has been appropriately developed, particularly if the parents express concern with respect to the student's rate of progress (see H.C. v. Katonah-Lewisboro Union Free Sch. Dist., 528 Fed. App'x 64, 66-67 [2d Cir. 2013]; Adrianne D. v. Lakeland Cent. Sch. Dist., 686 F.Supp.2d 361, 368 [S.D.N.Y. 2010]; M.C. v. Rye Neck Union Free Sch. Dist., 2008 WL 4449338, *14-*16 [S.D.N.Y. Sept. 29, 2008]; see also "Guide to Quality Individualized Education Program (IEP) Development and Implementation," at p. 18, Office of Special Educ. Mem. [Dec. 2010], available at http://www.p12.nysed.gov/specialed /publications/iepguidance/IEPguideDec2010.pdf). The fact that a student has not made progress under a particular IEP does not automatically render that IEP inappropriate, nor does the fact that an IEP offered in a subsequent school year which is the same or similar to a prior IEP render it inappropriate, provided it is based upon consideration of the student's current needs at the time the IEP is formulated (see Thompson R2-J Sch. Dist. v. Luke P., 540 F.3d 1143, 1153-54 [10th Cir.2008]; Carlisle Area Sch. Dist. v. Scott P., 62 F.3d 520, 530 [3d Cir. 1995]; S.H. v. Eastchester Union Free Sch. Dist., 2011 WL 6108523, at *10 [S.D.N.Y. Dec. 8, 2011]; D. D-S. v. Southold

---

[8] The Supreme Court has stated that even if it is unreasonable to expect a student to attend a regular education setting and achieve on grade level, the educational program set forth in the student's IEP "must be appropriately ambitious in light of his [or her] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives" (Endrew F., 580 U.S. at 402).

Union Free Sch. Dist., 2011 WL 3919040, at *12 [E.D.N.Y. Sept. 2, 2011], aff'd, 506 Fed. App'x 80 [2d Cir. 2012]; J.G. v. Kiryas Joel Union Free Sch. Dist., 777 F. Supp. 2d 606, 650 [S.D.N.Y. 2011]). Conversely, "if a student had failed to make any progress under an IEP in one year, courts have been "hard pressed" to understand how the subsequent year's IEP could be appropriate if it was simply a copy of the IEP which failed to produce any gains in a prior year (Carlisle Area Sch. Dist., 62 F.3d at 534 [noting, however, that the two IEPs at issue in the case were not identical]; N.G. v. E.L. Haynes Pub. Charter Sch., 2021 WL 3507557, at *9 [D.D.C. July 30, 2021]; James D. v. Bd. of Educ. of Aptakisic-Tripp Cmty. Consol. Sch. Dist. No. 102, 642 F. Supp. 2d 804, 827 [N.D. Ill. 2009]). Therefore, before turning to the merits of the district's and parents' appeals with respect to the 2020-21 school year, although the district's special education programming for the 2019-20 school year is not at issue, a review of the student's needs and his progress with that special education programming during the 2019-20 school year provides context for the discussion of the issues to be resolved—namely, whether the district's decision to recommend similar special education programs for subsequent school years was reasonably calculated to enable the student to make progress appropriate in light of his circumstances.

### 1. Student Needs and Progress from Prior School Year

The parents argue that the student's performance during the 2019-20 school year (sixth grade) demonstrated that he needed more intensive supports. In addition, the parents allege that the student did not meet his annual goals.

During the 2019-20 school year, the student attended sixth grade in a 15:1 special class placement at a district public school for instruction in English language arts (ELA) (eight 45-minute periods per week), mathematics (seven 45-minute periods per week), science (five 45-minute periods per week), and social studies (five 45-minute periods per week) (see Dist. Ex. 1 at pp. 1, 11). The student also received related services consisting of two 30-minute sessions per week of speech-language therapy in a small group, five 6-minute sessions per week of individual speech-language therapy, and one 30-minute session per week of OT services in a small group pursuant to his January 2019 IEP (id.).[9] The January 2019 IEP included a recommendation for 12-month programming: during July and August 2019, the student's special education program consisted of four 45-minute sessions per week of resource room in a small group and one 30-minute session per week of speech-language therapy in a small group (id. at pp. 1, 12). The January 2019 IEP included annual goals targeting his needs in the areas of reading (vocabulary and comprehension), writing (three-paragraph essay), mathematics (solving two-step problems and adding/subtracting positive and negative integers), speech and language (conjugating verbs, sematic relationships, articulation, and using context clues to determine meanings), and motor skills (handwriting and cursive writing) (id. at pp. 15-16).

---

[9] At the impartial hearing, a district witness explained that the five 6-minute sessions per week of individual speech-language therapy—or "six minute therapy"—focused "specifically on a student's articulation skills" (Tr. pp. 376-77). The same witness testified that the January 2019 CSE had discontinued the student's counseling services he had been receiving because "he had matured and he had achieved all of his counseling goals"; also, the witness testified that the student's "social development and his management needs" did not include any needs for counseling to address or to continue (Tr. p. 378). The January 2019 CSE also discontinued the "SEA," or "special education aide" for the student, and the district witness noted that the aide was "generally there to support the student with re-focusing or re-direction or things of that nature but [was] not limited to that" (Tr. p. 379).

During the 2019-20 school year, the district conducted the student's mandatory three-year reevaluation by completing a November 2019 health summary, a November 2019 classroom observation, a December 2019 learning evaluation, a December 2019 social and developmental history update, a December 2019 speech-language evaluation, a January 2020 OT evaluation, and a January 2020 psychological evaluation (see Dist. Exs. 28 at pp. 1, 12; 29 at p. 1; 30 at p. 1; 31 at p. 1; 32 at p. 1; 33-34).[10]

According to the January 2020 psychological evaluation report, an administration of the Wechsler Intelligence Scale for Children—Fifth Edition (WISC-V) to the student yielded a full-scale intelligence quotient (IQ) of 89, which fell within the "upper end of the low average range" (Dist. Ex. 28 at p. 3 [emphasis in original]). The evaluator explained the student's index scores, which fell within the below average range on verbal comprehension, within the low average range on visual spatial, within the average range on fluid reasoning, within the average range on working memory, and within the above average range on processing speed (id. at pp. 2-5). With regard to the difference in the student's performance on the auditory and visual subtests of the working memory index, the evaluator noted that, "[g]iven this unusual difference in scores, caution [wa]s the interpretation of the overall" score in the average range (id. at pp. 4-5).

The January 2020 psychological evaluation included the administration of the Behavior Assessment System for Children—Third Edition (BASC-3) parent and teacher rating scales (see Dist. Ex. 28 at pp. 5-11; see generally Dist. Ex. 50 [reporting teacher rating scales]).[11] As noted in the evaluation report, BASC-3 scores falling in the "Clinically Significant Range suggest[ed] high levels of maladjustment; while scores in the At-Risk range identif[ied] a problem that may not be severe enough to require formal treatment, but may identify a potential of developing a problem that needs careful monitoring" (Dist. Ex. 28 at p. 5). The parent rating scale included four composite scores: externalizing problems, internalizing problems, adaptive skills, and behavioral symptoms (id. at p. 8).[12] The teacher rating scale included the same four composite scores as well as a fifth composite score, school problems (id.). Overall, the completed parent and teacher rating scales resulted in the following scores: externalizing problems, average (teacher and parent ratings); internalizing problems, clinically significant (teacher rating) and average (parent rating); school problems, at-risk (teacher rating only); behavioral symptoms, at-risk (teacher and parent ratings); and adaptive skills, at-risk (teacher rating) and average (parent rating) (id. at pp. 7-8). As reflected in the January 2020 psychological evaluation report, the teacher ratings for internalizing problems presented as a "significant area of concern," noting that the teacher "almost always observe[d] [the student] as being fearful, easily stressed, worrying, and afraid of making mistakes" (id. at pp. 8-9 [emphasis in original]). In addition, the teacher ratings indicated that the student

<hr>

[10] Although the January 2020 psychological evaluation report of the student bears an evaluation date of October 30, 2019, it was not signed until January 9, 2020; therefore, for ease of reference, it will be referred to as the January 2020 psychological evaluation in this decision (see Dist. Ex. 28 at pp. 1, 12).

[11] As noted in the evaluation report, the BASC-3 "raters indicate[d] how often the child display[ed] these behaviors by answering Never, Sometimes, Often, or Almost Always" (Dist. Ex. 28 at p. 5).

[12] The adaptive skills composite of the BASC-3 consisted of the following areas: adaptability, social skills, leadership, and functional communication (see Dist. Ex. 28 at p. 10). In addition, the adaptive skills composite incorporated an activities of daily living (ADL) skills component at home and a study skills component at school (id.).

"often worrie[d] about things that c[ould not] be changed, [wa]s nervous," and he was "nervous about tests" (id. at p. 9 [emphasis in original]). The evaluation report indicated that the student "present[ed] as pessimistic and often crie[d] easily, [wa]s easily upset, and ma[de] statements about not being able to do anything right in school" (id.). In contrast, the evaluator noted that the student did not make "negative statements regarding his perception of his friendships or statements of hating himself in school" (id.).

With regard to the school problems composite, the teacher's rating scores indicated that, although he received a modified curriculum, the student "continue[d] to demonstrate some learning difficulties that warrant[ed] close monitoring"—noting that the "[i]tem analysis would suggest that [the student] ha[d] the most difficulties in reading and math, but only sometimes struggle[d] with spelling" (Dist. Ex. 28 at p. 9). The student "often ha[d] difficulty keeping up with the pace of the class," and exhibited "attention difficulties" that required "monitoring in the small class setting as well as at home" (id. [emphasis in original]). In addition, the student "almost always ma[de] careless mistakes and [wa]s easily distracted" (id. [emphasis in original]). The evaluator found it "important to note here that [al]though [the student] sometimes listen[ed] to directions, this tendency to only sometimes do so in conjunction with his speech\language impairment [wa]s expected to exacerbate his attention difficulties" (id. [emphasis in original]). The evaluator also found it "important to note [that the] relationship of [the student's] anxiety and [his] inattention c[ould] be cyclic," meaning that he could "become anxious when he [wa]s distracted and d[id] not know what to do, but his anxious thought c[ould] also serve as a distractor from directions and tasks" (id. at pp. 9-10).

With regard to the adaptive skills composite, it was noted that, in school, the student had "difficulty adapting to changing situations and c[ould] take longer to recover from difficult situations to an at-risk level" (Dist. Ex. 28 at p. 10). The student's teacher reported that the student "trie[d] his best to bounce back from stressful situations," and, while he required "some support in terms of his behavior in class," the student was "consistently receptive to this support" (id.). Both the parents and the teacher rated the student as "At-Risk" in the areas of functional communication and leadership skills (id.). However, with respect to adaptability, the student's skills were "more developed in the home setting," and the raters' scores reflected that the student's ADL skills, study skills, and social skills were "each found to be typical to strong for his age" (id. at p. 11). As a result, the student's adaptive composite was "found to be at-risk in school, but average at home" (id.).

As for recommendations, in the January 2020 psychological evaluation report the evaluator noted that the student was a "visual learner," he benefitted from "repetition and simplification of directions and expectations," and "[a]dditional models [we]re expected to aid his learning, as well as visual cues such as highlighting key words, providing written word banks, and using checklists" (Dist. Ex. 28 at p. 12). In addition, the evaluator noted that "verbal directions should be paired with visuals whenever possible," that the student should be provided with "[f]requent check-ins to ensure he underst[ood] new lessons and that the language [wa]s simplified and broken down to an obtainable level for him" (id.). The evaluator opined that, while the student's counseling services had been "discontinued last year due to his progress and a lack of educational need, it would appear that counseling as a related service should again be considered" for the student (id.). According to the evaluator, due to the student's "level of internalized difficulties expressed in class, as well as his decreased frustration tolerance, it [wa]s important to explore the need for this pull-out service

in order to build [the student's] coping skills" (id.). The evaluator further opined that, even though it appeared that "these behaviors [we]re directly addressed in his current 15:1 placement, this may not be the case in the Junior High School and should be considered as an additional support" for the student (id.).

Next, as part of the December 2019 learning evaluation, the student's then-current classroom teacher administered the Weschler Individual Achievement Test, Third Edition (WIAT-III) to the student, which yielded the following standard scores (SS) in the area of reading: total reading composite, SS 80 (below average); basic reading composite, SS 82 (below average); and reading comprehension and fluency composite, SS 80 (below average) (see Dist. Ex. 32 at pp. 1-2). In the reading subtests that comprised the composite scores, the student's scores ranged from 79 in reading comprehension to 93 in oral reading rate (id. at p. 1). The evaluator noted that the student's performance on the word reading (SS, 82), pseudoword reading (SS, 82), and reading comprehension subtests all fell in the "below average range" (id. at pp. 1-2). The student performed in the average range on the oral reading fluency subtest (SS, 90) (id.). On the writing component of the WIAT-III, the student achieved a written expression composite SS of 86 (average), with related subtest SS ranging from 72 to 113 (id. at pp. 1-2).[13] The evaluator noted that his performance on the sentence combining subtest (SS, 113) and the sentence building subtest (SS, 104) both fell within the average range; however, the student's performance on the essay composition subtest (SS, 77) and the spelling subtest (SS, 81) both fell within the below average range (id.). Finally, in the area of mathematics, the student achieved a math fluency composite SS of 90 (average) and a math composite SS of 76 (below average), with related subtest SS ranging from 66 to 95 (id. at pp. 1-2). The evaluator noted that the student's performance on the math problem solving subtest (SS, 66) fell within the low range, but his performance on the numerical operations subtest (SS, 88), the math-fluency addition subtest (SS, 87), math-fluency subtraction subtest (SS, 95), and math-fluency multiplication subtest (SS, 91) all fell within the average range (id. at pp. 1-3). The evaluator found that the student "appeared to have the most difficulty when it came to interpreting data from a graph and answering questions based on that data" (id. at p. 2).

In addition to the WIAT-III, the student's then-current classroom teacher also administered the Gray Diagnostic Reading Test (GDRT-2) to the student to assess his reading abilities (see Dist. Ex. 32 at pp. 2-3, 5). The student achieved average scores on the following subtests: reading vocabulary, meaningful reading, rapid naming, and phonological awareness subtests; however, the student performed in the below average range on both the phonetic analysis and letter/word recognition subtests, and within the "very poor range" on the listening vocabulary subtest (id. at pp. 3, 5). According to the evaluator, the student's performance on the listening vocabulary subtest was "commensurate with [his] classroom performance, where he present[ed] with difficulty manipulating and identifying higher level vocabulary words" (id. at p. 3).

Next, the student's speech-language skills were assessed in December 2019 by administering the Clinical Evaluation of Language Fundamentals—Fifth Edition (CELF-5) to the student, which yielded an overall core language standard score of 79 (below average) (see Dist. Ex. 30 at pp. 2-3). On the Goldman-Fristoe Test of Articulation 3 (GFTA-3), the student achieved a standard score of 109 (average) at the single word level (id. at pp. 2, 4). The evaluator, a district

---

[13] The student achieved a SS of 72 on the theme development text organization subtest in writing (see Dist. Ex. 32 at p. 1).

speech-language pathologist who had delivered speech-language therapy services to the student continuously since kindergarten, indicated that the student continued to "demonstrate difficulty with multisyllabic words, and low frequency or unfamiliar words due to his oral-motor and generalized dyspraxia of speech" (Dist. Ex. 30 at p. 4; see Tr. pp. 413, 419). The evaluator also noted that "[t]his impact[ed] him academically in the classroom as a focus on content areas increase[d]" and that "[c]ontent area vocabulary in Science and Social Studies present[ed] [the student] with increased articulation challenges and decreased intelligibility of speech," which "impact[ed] his ability to engage in classroom discussions effectively during lessons" (Dist. Ex. 30 at p. 4).

On January 29, 2020, a CSE convened to conduct a "re-evaluation annual review" meeting, which, according to the evidence in the hearing record, occurred at the district when a student "had their mandated three-year review" (Tr. p. 382; see generally Dist. Exs. 2; 58). As a result, the evidence reflects that the January 2020 CSE meeting generated two separate IEPs for the student: one IEP reflected the student's special education program for the remainder of the 2019-20 school year (see generally Dist. Ex. 2), and the other IEP reflected the student's special education program for the 2020-21 school year, which included different annual goals and any changes made to the student's program from the previous school year (see generally Dist. Ex. 58). As part of this process, and as relevant to this appeal, the January 2020 CSE reviewed and discussed the student's reevaluation reports, and relying on that evaluative information, as well as the input from the CSE members, developed the student's IEP for the 2020-21 school year (see generally Dist. Exs. 11; 58).[14] Finding that the student remained eligible for special education as a student with speech or language impairment, the January 2020 CSE recommended a 15:1 special class placement for instruction in ELA (eight 42-minute periods per week), mathematics (seven 42-minute periods per week), science (five 42-minute periods per week), and social studies (five 42-minute periods per week) (see Dist. Ex. 58 at pp. 1, 11). In addition, the January 2020 CSE recommended related services consisting of one 42-minute session of speech-language therapy in a small group (5:1) on alternate days of a six-day cycle and two 30-minute sessions per month of individual counseling (id.).[15] The January 2020 IEP included annual goals targeting the student's needs in reading, writing, mathematics, speech and language, and social/emotional/behavior (id. at p. 10). In addition, the January 2020 CSE recommended supplemental aids and services, program modifications, and accommodations including organizational strategies, simplifying complex directions, highlighted work, visual cues, and access to a computer (id. at pp. 11-12). At the impartial hearing, the January 2020 CSE chairperson testified that the CSE recommended that the student continue in a 15:1 special class placement because "it seems like that he was meeting with the most academic success in that placement" during the 2019-20 school year (fifth grade) (Tr. pp. 392-93). She also testified that the elementary school "team . . . [had] visited the different

---

[14] The January 2020 CSE meeting included the student's then-current special education classroom teacher in his 15:1 special class, his speech-language therapy provider, his regular education physical education teacher, a district chairperson, a district school psychologist, and the student's mother (compare Dist. Ex. 58 at p. 1, with Dist. Ex. 51 at p. 1, and 52 at p. 1, and Dist. Ex. 30 at p. 1). The student's special education teacher during the 2019-20 school year also taught the student in third and fourth grade (see Tr. pp. 499, 501).

[15] Based on the January 2020 OT evaluation, the January 2020 CSE discontinued the student's OT services for the 2020-21 school year (compare Dist. Ex. 2 at pp. 1-2, 10, with Dist. Ex. 58 at pp. 1-2, 11).

programs within the [d]istrict," they had "spoken to the personnel that [wa]s included within those programs and then they ma[d]e the best recommendations for their students" (id.).

The January 2020 CSE also documented parental concerns expressed at the meeting within the IEP. For example, the IEP noted that, per parent report, the student could be "hard on himself" at home, and, when doing homework, he often requested "help even when [she] fe[lt] he [wa]s capable of doing it on his own" (Dist. Ex. 58 at p. 2). The parent also expressed her concern about the student "having access to the building support team during the day" when he transitioned to the junior high school in the 2020-21 school year (id.). The CSE "assured" her that "all students in the Junior High have access to [the] support team and counselors" (id.).

The student's sixth grade special education teacher attended the January 2020 CSE meeting and at the meeting, she reviewed the results of the WIAT-III she administered to the student, as well as the results of the GDRT-2 (see Tr. pp. 535-36). She also discussed the supports provided to the student in class and recommendations for the student (Tr. p. 536). In reporting the student's progress at the January 2020 CSE meeting, the special education teacher noted his need for support to slow down and to ask for support, the importance of visual supports, and the strategies that worked for the student (see Tr. pp. 536-37, 592-93).

Based on the evidence in the hearing record, the student continued to receive the special education program set forth in the student's updated IEP for the 2019-20 school year—which indicated a projected implementation date of February 12, 2020—since the January 2020 IEP for the 2020-21 school year reflected a projected implementation date of September 8, 2020 (see Tr. pp. 590-91; compare Dist. Ex. 2 at pp. 1-2, with Dist. Ex. 58 at pp. 1-2). Subsequent to the January 2020 CSE meeting, it was discovered that the student's January 2020 IEP for the 2020-21 school year mistakenly omitted 12-month programming, so the parties agreed to amend the student's IEP in March 2020 without a meeting to add resource room (four 45-minute sessions per week, small group) as the student's summer services (see Dist. Exs. 3 at pp. 1, 10; 12 at p. 1). The evidence in the hearing record also indicates that, in mid-March 2020, the district transitioned to remote instruction in light of the COVID-19 pandemic (see Tr. pp. 530-31). Generally speaking, the student's sixth grade special education teacher followed the district's guidance on when they could "begin asynchronous instruction and then later on synchronous instruction (Tr. p. 531; see Tr. pp. 636-37). When able to begin the asynchronous instruction, the special education teacher testified that she structured her day "through assignments," and would daily "post assignments in various areas, reading, vocabulary, science social studies, math, [and] writing" (Tr. p. 532). She also checked in with students who posted comments and responded to questions posed by students (see Tr. p. 532). When able to begin synchronous instruction, she recalled meeting at least once with the student in 1:1 situation with respect to mathematics and, toward the end of the school year, he joined her virtual review sessions a few times (see Tr. pp. 532-33). Overall, she characterized the student's participation in virtual instruction as "very high," he was completing his work (even if not on time), and he participated by commenting and asking questions (Tr. pp. 533-34).

During remote instruction, the special education teacher recalled the parents having a "hard time doing some of the assignments" with the student (Tr. pp. 534-35).

In June 2020, the district issued the student's final progress report for the 2019-20 school year with respect to his annual goals (see generally Dist. Ex. 40). The progress report reflects that, while the student did not achieve his annual goals in reading, writing, or mathematics to the criteria

set forth to each annual goal, he did achieve three out of four of his annual goals in speech-language therapy and one out of two annual goals in the area of motor skills (OT) (id. at pp. 2-7). With respect to his academic annual goals, the progress report reflects that the student made progress on these annual goals, which had been denoted as either progressing gradually or progressing satisfactorily (id. at pp. 2-4). However, it was also noted that on one mathematics annual goal, the student was progressing inconsistently during the second reporting period (id. at p. 4).

At the impartial hearing, the special education teacher acknowledged that the student did not achieve his academic annual goals for the 2019-20 school year (see Tr. p. 625; Dist. Ex. 40 at pp. 2-4). However, she explained that the "instruction had greatly changed during that time"—meaning, during spring 2020 and the COVID-19 pandemic—and based on her "experience working with [the student] in person as well as what [she] had seen when [she] did work with him during any synchronous workshop times on Google Meet, [she] was not concerned moving forward that the placement recommendation was inappropriate" even though the student had not achieved his annual goals in academics (Tr. pp. 625-26). She also explained that, when a goal is marked as achieved, it was based on "straight data collection" and even though she continued to collect data through the "Google classroom, it was not for [her] to say at the time that [the student] was completing those assignments independently which was very understandable," given the difficulties during that time period (Tr. p. 626). She also knew that, at the start of the 2020-21 school year, "it was absolutely within the realm of possibilities based on their baseline assessments, the goals could have been adjusted" for the student (Tr. pp. 626-27). The special education teacher also acknowledged that, during spring 2020, her "instruction was completely different," and she felt as though she had to take that into consideration as well (Tr. p. 627). In addition, the special education teacher testified that, based on her recollection, the annual goals in the student's January 2020 IEP for the 2020-21 school year were not changed or modified because "it was so uncertain what the school year was going to look like and the end of that [20]19-20 school year had changed so drastically" (Tr. pp. 631-32). According to the special education teacher, it was hoped that "when [seventh] grade started"—and depending on whether the student attended in-person or remotely—"he would be assessed, his goals would be looked at, and any necessary changes at that time could be made with an IEP amendment" (Tr. p. 632; see Tr. p. 634).

The hearing record also includes the student's final report card for the 2019-20 school year (see Dist. Ex. 43). However, the report card only reflected the student's achievement in special areas, such as art, music, health, and physical education (id.).

During the 2020-21 school year, the student attended seventh grade in the recommended 15:1 special class placement at a district junior high school (see generally Dist. Ex. 41; 44). Students returned to the classroom for in-person instruction for this post-COVID school year but had the option to attend virtually; the student in this case returned for in-person instruction (see Tr. pp. 862, 866-68). In September and October 2020, the parents privately obtained a psychological diagnostic evaluation of the student and the district conducted a speech-language reevaluation of the student at the parents' request (see Dist. Exs. 36 at p. 1; 37 at p. 1). On December 16, 2020, a CSE convened to review the newly obtained evaluations, as well as a letter penned by the student's nurse practitioner (see Dist. Ex. 4 at pp. 1-2; see generally Dist. Exs. 35-37). As part of the October 2020 psychological diagnostic evaluation, the evaluator administered the Autism Diagnostic Observation Schedule—Second Edition (ADOS-2) (modified), the Childhood Autism Rating Scale—Second Edition (CARS-2), the Vineland Adaptive Behavior

Scales, Third Edition (Vineland-3) (comprehensive interview form), and the Swanson, Nolan and Pelham—Fourth Revision Teacher and Parent Rating Scale (SNAP-IV), and conducted interviews of the student's mother and the student himself (see Dist. Ex. 36 at p. 1).[16] According to the evaluator, the Vineland-3 results indicated that the student had "difficulty carrying out" his ADL skills (id. at p. 6). Based on the overall evaluation results, the student was diagnosed as having an autism spectrum disorder ("mild end of the spectrum"), an expressive and receptive language disorder, and a "r[ule]/o[ut] Intellectual Disability, borderline intellectual functioning" (Dist. Ex. 36 at p. 7; see Dist. Ex. 4 at p. 1). In addition, the evaluator recommended, in part, that autism was the student's "appropriate educational classification," that the student receive "[o]ngoing special education . . . . with intensive speech and language therapy services," and that services through the Office for People with Developmental Disabilities (OPWDD) would be "helpful in improving [the student's] social, academic, and daily living skills" (Dist. Ex. 36at p. 8).[17]

The October 2020 letter from the nurse practitioner indicated that the student had been diagnosed as having an attention deficit hyperactivity disorder (ADHD), inattentive presentation, as well as an autism spectrum disorder and a "significant expressive and receptive language disorder" (Dist. Ex. 35). At that time, the nurse practitioner recommended that the student should "continue[] with his ongoing special education and also receive[] intensive speech and language therapy services, which w[ould] help with his social communication deficits" (id. [emphasis in original]).[18]

The district's October 2020 speech-language reevaluation included the administration of the Test of Language Development—Intermediate: Fourth Edition (TOLD-I:4), the Comprehensive Assessment of Spoken Language, Second Edition (CASL-2), the Test of Auditory Processing Skills (TAPS-4), and the Goldman-Fristoe Test of Articulation 3 (GFTA3) (see Dist. Ex. 37 at pp. 1-2). When discussing the October 2020 speech-language reevaluation at the December 2020 CSE meeting, it was noted that the results were "consistent with [the student's] last speech and language evaluation in 2019," noting however that the student had "significant language weaknesses in several areas" (Dist. Ex. 4 at p. 1). The IEP also reflected that the student did not have "any articulation deficits" (id.).

At the December 2020 CSE meeting, the parents' attorney expressed their concern that the student was "not progressing and ha[d] even regressed" (Dist. Ex. 4 at p. 2). The parents were also concerned about the student's "classification" and requested "additional services 1:1 on alternating days or at least twice per week" (id.). The parents based their request for additional services on the recommendation in the October 2020 psychological diagnostic evaluation for "intensive speech and language therapy" (id.). Upon discussion, the December 2020 CSE developed "two new annual goals—one for vocabulary of multiple meaning words and another for using the past tense

---

[16] The Vineland-3 assessed the student's communication, ADL, and socialization skills (see Dist. Ex. 36 at p. 6). The results of the Vineland-3 were based solely on the parents' reports (id.).

[17] The October 2020 psychological diagnostic evaluation did not include a specific level of speech-language therapy services as part of the recommendations (see Dist. Ex. 36 at p. 8).

[18] To be clear, the letter did not include any evaluative information or refer to any evaluations as the basis for the nurse practitioner's recommendations, nor did the nurse practitioner recommend a specific level of speech-language therapy services (see generally Dist. Ex. 35).

in sentences" (id. at pp. 2, 11). In addition, the CSE recommended one 42-minute session per week of individual speech-language therapy, continued the student's group speech-language therapy, and changed the student's eligibility category from speech or language impairment to autism (id. at pp. 1-2, 11, 12). In order to accommodate the additional speech-language therapy session within his schedule, the December 2020 CSE reduced the student's 15:1 special class placement for ELA instruction from eight times weekly to seven times weekly (id. at pp. 1-2; see Tr. pp. 122-23).[19] Finally, the CSE recommended one 60-minute session per quarter of individual parent counseling and training services to the IEP (see Dist. Ex. 4 at pp. 1-2).

## 2. Supports for Executive Functioning and Adaptive Skills

The parent argues that the student's special education teacher knew of the student's executive functioning needs but did not recommend an annual goal or programming to address this need.[20]

During the 2019-20 school year, the student's sixth grade special education teacher testified she provided the class with "visuals and color coding" to address the students' executive functioning skills (Tr. p. 506). She explained that executive functioning skills were addressed throughout the school day using "strategies embedded" in either the work she was setting out for the students or concepts being worked on at that time (Tr. pp. 513-14). For example, all of the students' folders were color coded for reading (blue) and writing (green) (see Tr. p. 514). In addition, she discussed with the class how to "identify . . . things that might distract" them, or when working in partners, how to select the best place within the classroom to work (Tr. p. 514). Overall, she attempted to help the students build an "awareness of what help[ed them] maintain attention to task"—such as "sitting on the yoga ball" or a different chair (Tr. pp. 514-15). In addition, the special education teacher used visuals (see Tr. p. 515). With this specific student, the special education teacher had conversations with him about losing focus or "drift[ing] off," and providing him with "visuals" and "prompting" (both verbal and nonverbal) (Tr. p. 515). She also noted that the student, at times, had difficulty "planning and prioritizing in terms of the steps in a process," so they worked on breaking down the directions (Tr. pp. 515-16).

At the impartial hearing, the student's special education teacher testified that, during the 2020-21 school year (seventh grade), the student exhibited executive functioning issues with regard to "time management and planning as far as assignments at home" (Tr. pp. 907-08). She also testified that organization was not much of an issue for him because "most of everything was on that Chromebook so it was kind of organized for him" (Tr. p. 908). Additionally, she testified that "everything was posted on Google Classroom," and "reminders" were given at the start and end of the class periods, as well as during the support period (Tr. p. 908). The students were also directed to "fill in their planners even though it was posted on Google Classroom just to get them in that habit of writing things down" (Tr. p. 908). With regard to task initiation, she explained that

---

[19] At the impartial hearing, the December 2020 CSE chairperson testified that the CSE agreed that the one period reduction of the student's 15:1 special class placement for ELA instruction was not problematic, as he was "making progress in his academics" and the student would derive more benefit from 'being in the speech class" (Tr. pp. 119-20; see Tr. pp. 122-23).

[20] During the 2020-21 school year, the student's special education teacher for ELA and science also acted as his case manager and support class teacher (see Tr. pp. 856-57, 971).

the student would often initially respond with "I don't know," so during the 2020-21 school year, the special education teacher worked on having the student read the directions or review worksheets in order to figure out how to proceed, rather than defaulting to his "automatic go to [of] I don't know" (Tr. pp. 908-09).

During cross-examination, the special education acknowledged that, although she knew of the student's executive functioning issues with time management and task initiation, she did not recommend an annual goal on the student's IEP to address these needs (see Tr. p. 995).[21] She explained on her redirect testimony that "executive functioning [wa]s something that [wa]s worked on all throughout the school year and school day" (Tr. p. 1002). The special education teacher also testified that they "constantly work[ed] on time management, planning, task initiation" and it was "something that [wa]s there for all students so it didn't need a specific goal," noting further that it was "something that was worked on in class throughout the day" (Tr. p. 1002).

In addition, the student's January 2020 IEP had included supports for his executive functioning skills (see Dist. Ex. 58 at p. 9). As strategies to address the student's management needs, the January 2020 CSE noted that he needed the "support of special education in order to be successful throughout his school day," which included a "firm, structured setting where rules and expectations [we]re clear, in addition to the support of a positive reinforcement plan" (id.). The CSE also noted that the student required "directions to be broken down and clarified, as well as the support of visual cues (i.e. pictures, highlighting) in order to facilitate understanding" (id.). The student also required "modified assignments in order to work independently, as well as small group instruction to address deficits" in his academics (i.e., reading, writing, and mathematics) (id.). The CSE indicated that the student required "repetition and review of previously taught concepts, as well as clear-cut examples to serve as a source of guidance"; in addition, the student needed a "multi-sensory approach to learning to best facilitate understanding" (id.). And notably, the CSE indicated that the student benefitted "greatly from support with executive functioning skills" and identified "[m]ethods of support [as] include[ing] self-monitoring checklists, self check-ins, and self-questioning" (id.). Additionally, the January 2020 IEP included recommendations for the use of organizational strategies throughout the school day in all academic settings as one form of supplementary aids and services, program modifications, and accommodations to address the student's needs (id. at p. 11).

The January 2020 IEP also described the student as presenting with "delays in speech-language skills, reading comprehension, vocabulary, written expression, mathematics, and executive functioning skills," which affected his "rate of progress" (Dist. Ex. 58 at p. 10).

In comparison, the December 2020 IEP continued to recommend the same strategies to address the student's management needs and continued to describe the student's executive functioning skills as one area that affected his rate of progress (compare Dist. Ex. 4 at pp. 10-11,

---

[21] To be clear, the student's seventh grade special education teacher did not participate in the development of his January 2020 IEP for the 2020-21 school year (see Dist. Ex. 58 at p. 1). She did participate in the December 2020 CSE meeting to review the parents' privately obtained evaluations and at the student's annual review in June 2021 to develop his IEP for the 2021-22 school year (see Dist. Exs. 4-5).

with Dist. Ex. 58 at p. 10).[22] Neither the January 2020 IEP nor the December 2020 IEP included an annual goal specifically targeting the student's executive functioning needs (see Dist. Exs. 4 at pp. 9-10; 58 at p. 10). Nevertheless, the IDEA does not require that a district create a specific number of goals for each of a student's deficits, and the failure to create a specific annual goal does not necessarily rise to the level of a denial of FAPE; rather, a determination must be made as to whether the IEP, as a whole, contained sufficient goals to address the student's areas of need. (J.L. v. New York City Dep't of Educ., 2013 WL 625064, at *13 [S.D.N.Y. Feb. 20, 2013]; see C.M. v. New York City Dep't of Educ., 2017 WL 607579, at *20-*21 [S.D.N.Y. Feb. 14, 2017]). Overall, the evidence in the hearing record does not support any claims that the student's IEPs for the 2020-21 school year were inappropriate because they failed to include an annual goal for executive functioning skills, especially when, as here, the parents did not raise any claims that the IEPs mischaracterized or did not clearly identify the student's areas of need.

Next, the parent argues that the October 2020 psychological diagnostic evaluation identified that the student had adaptive functioning needs but that the December 2020 IEP included no annual goals in this area. As reflected in the Vineland-3 results, the student's "overall adaptive behavior" fell within the "moderately low range" (Dist. Ex. 36 at p. 6). In the area of communication, the student could receptively "follow basic instruction but ha[d] difficulty with multistep instructions" (id.). The student also could not "follow directions previously heard" (id.). The evaluator noted that the student had "difficulty paying attention to information talks unless they [we]re of interest for him" (id.). As to his expressive language, the evaluator indicated that the student used "full and complex sentences but [wa]s unable to provide details about daily experiences and about one-time, non-routine events" (id.). The student knew his birth date and address, and with regard to written expression, the evaluator noted that the student could "read and understand at about a fifth-grade level" and could "write a full page but it d[id] not always make sense" (id.).

With respect to his ADL skills, the evaluator noted that the student was "independent with self help skills such as eating, dressing and toileting"; he could "select weather appropriate clothing," but could not "use a knife to cut food"; the student independently washed his hair, but would "not do so without prompting"; and although he did not "always hang a wet towel," he could put away clean clothes (Dist. Ex. 36 at p. 6). When riding in a car, the student "follow[ed] safety precautions," but he could not "safely cross the street on his own" and had "recently almost [been struck] by a car in the school lot when he ran quickly [a]cross without looking" (id.). The student could "follow community rules," but did not "set goals for himself"; the student could also use a "computer and tablet," but did not "remember to lock doors and ha[d] difficulty with household chores" (id.).

Turning to the area of socialization, the student displayed "variable eye contact and sometimes seem[ed] to stare" (Dist. Ex. 36 at p. 6). The student was noted to speak in a "robotic

---

[22] At the impartial hearing, the December 2020 CSE chairperson referenced the "Smarts Curriculum," which he explained was a specific curriculum available to teach executive functioning skills (Tr. pp. 139-40). When asked if this student had "ever [been] offered the Smarts Curriculum for executive functioning," the CSE chairperson testified that he did not "know much about that" since the student's executive functioning was not "part" of the CSE meeting and he did not recall a discussion about his executive functioning (Tr. pp. 140-41). The December 2020 CSE chairperson also testified, however, that he had never worked with the student prior to this CSE meeting (see Tr. p. 144).

and monotone voice," and he was "not always aware of the likes and dislikes of others" (id.). According to the evaluator, the student had "trouble sustaining conversations and engaging in small talk," and he did not "change his behavior based on how well he kn[ew] others" (id.). In addition, it was noted that the student preferred "adults or younger children to peers his own age," and he had "difficulty accepting criticism and c[ould] sometimes [b]e a sore loser" (id.).

In reviewing the December 2020 IEP, the summary of the meeting does not reflect a substantive discussion regarding the results of the Vineland-3 or the student's overall adaptive behavior skills (see Dist. Ex. 4 at pp. 1-2). At the impartial hearing, the December 2020 CSE chairperson testified that, following introductions, the meeting began with the district speech-language pathologist providing feedback about the evaluation she had completed (see Tr. pp. 108-10; see generally Dist. Ex. 37). He also testified that the speech-language evaluation was not the only testing reviewed by the CSE, pointing to the letter from the nurse practitioner and the October 2020 psychological diagnostic evaluation (see Tr. p. 112). The CSE also solicited input from the student's teachers, which included his then-current special education teacher and a regular education teacher who provided literacy instruction, as well as input from the parents (see Tr. pp. 112-14; Dist. Ex. 4 at p. 1). According to the CSE chairperson, the parents' primary concern focused on whether the student was regressing in his language skills; he testified that the CSE did not agree with this assertion and then explained the basis for the CSE's position (see Tr. pp. 114-18). He also testified that, having spoken with the parents and staff, no other areas of concern were brought to the CSE's attention (Tr. p. 119).[23] Next, the CSE chairperson explained the rationale for changing the student's eligibility category to autism—pointing to the October 2020 psychological diagnostic evaluation, which resulted in the student having been diagnosed with autism (see Tr. pp. 120-21). The December 2020 CSE also recommended parent counseling and training based on the student's recent diagnosis (see Tr. p. 122).

During cross-examination, the parents' attorney initially questioned the December 2020 CSE chairperson about the student's adaptive behavior skills as related to whether the student's speech-language services needed to be changed based on the testing results in the areas of communication (less than first percentile) and socialization (less than first percentile) or based on the evaluator's recommendation for "intensive speech and language services" (see Tr. pp. 145-60). The parents' attorney then asked whether the December 2020 CSE discussed transition planning in light of the student's testing results in the area of ADL skills (fourth percentile) on the October 2020 psychological diagnostic evaluation (Tr. pp. 160-61). The CSE chairperson acknowledged that, "per the Vineland, yes," the student's "score was very low," but the CSE did not discuss transition planning (Tr. p. 161). He also testified that, even though it was "new information for the CSE," the present levels of performance in the IEP were not updated with respect to the area of ADL skills (Tr. p. 161).

On redirect examination, the December 2020 CSE chairperson explained that the Vineland-3 results were based solely on the parent questionnaire, and, while a CSE relied on that parent questionnaire, it did not rely on it exclusively because it was "not an objective measure" (Tr. pp.

---

[23] The prior written notice related to the December 2020 CSE meeting, dated January 7, 2021, noted that while the CSE "considered all previous evaluations listed" on the IEP, the CSE "primarily discussed [the student's] recent speech and language evaluation and outside psychological evaluation" (Dist. Ex. 15 at p. 1). The December 2020 CSE chairperson testified that he prepared the prior written notice (see Tr. pp. 127-28).

166-67). He explained that for the CSE, when considering the student's specific language skills, it was important to know that other rating scales existed, such as teacher ratings and self-reports; thus, since the Vineland-3 results were based solely on the parent questionnaire, it was significantly "limited in its scope" with regard to "creating a speech language intervention" (Tr. pp. 167-68).

Based on the foregoing evidence, and similar to the finding with regard to the absence of an annual goal for executive functioning, the January 2020 CSE's failure to include an annual goal to address any adaptive behavior needs does not, here, rise to the level of a denial of FAPE, since the IEP, as a whole, contained sufficient goals to address the student's areas of need. (J.L., 2013 WL 625064, at *13; see C.M., 2017 WL 607579, at *20-*21).

### 3. Reading Instruction

The parents allege that evaluations available to the CSE reflected the student's deficits in decoding such that the CSE should have recommended research-based instruction in decoding. More specifically, the parents point to the December 2019 learning evaluation report, which, according to the parents, put the district on notice of the student's "severe deficits in decoding." In addition, the parents contend that they specifically raised the argument in their closing brief to the IHO that the student's scores on the December 2019 learning evaluation were "below average in pseudoword decoding, total reading, basic reading, and reading comprehension" and that the student did not receive any research-based reading instruction in decoding during the 2019-20 school year. The parents also argue that the hearing record did not include any evidence that the student made progress in reading during the 2020-21 school year.

State regulation defines "specially designed reading instruction" as "specially designed individualized or group instruction or special services or programs, as defined in subdivision 2 of section 4401 of the Education Law, in the area of reading . . . which is provided to a student with a disability who has significant reading difficulties that cannot be met through general reading programs" (8 NYCRR 200.6[b][6]). Education Law § 4401(2), in turn, sets for the definitions of "[s]pecial services or programs," which includes, among other things, special classes, resource rooms, consultant teacher services, and related services. Consistent with the reference to the various special services or programs included in the definition of special education under State Law, State guidance notes that specialized reading instruction could be recommended in the IEP of the student as a special class, direct consultant teacher service, related service, resource room program ("Questions and Answers on Individualized Education Program (IEP) Development, The State's Model IEP Form and Related Requirements," at p. 31, Office of Special Educ. Mem. [Updated Oct. 2023], available at https://www.nysed.gov/sites/default/files/programs/special-education/questions-answers-iep-development_0.pdf).).

In addition, generally, an IEP is not required to specify the methodologies used with a student and the precise teaching methodologies to be used by a student's teacher are usually a matter to be left to the teacher's discretion—absent evidence that a specific methodology is necessary (Rowley, 458 U.S. at 204; R.B. v. New York City Dep't of Educ., 589 Fed. App'x 572, 575-76 [2d Cir. Oct. 29, 2014]; A.S. v. New York City Dep't of Educ., 573 Fed. App'x 63, 66 [2d Cir. July 29, 2014]; K.L. v. New York City Dep't of Educ., 530 Fed. App'x 81, 86 [2d Cir. July 24, 2013]; R.E., 694 F.3d at 192-94; M.H., 685 F.3d at 257). As long as any methodologies referenced in a student's IEP are "appropriate to the [student's] needs," the omission of a particular

methodology is not necessarily a procedural violation (R.B., 589 Fed. App'x at 576 [upholding an IEP when there was no evidence that the student "could not make progress with another methodology"], citing 34 CFR 300.39[a][3] and R.E., 694 F.3d at 192-94). Indeed, a CSE should take care to avoid restricting school district teachers and providers to using only the specific methodologies listed in a student's IEP unless the CSE believes such a restriction is necessary in order to provide the student a FAPE. However, when the use of a specific methodology is required for a student to receive an educational benefit, the student's IEP should so indicate (see, e.g., R.E., 694 F.3d at 194 [finding an IEP substantively inadequate where there was "clear consensus" that a student required a particular methodology, but where the "plan proposed in [the student's] IEP" offered "no guarantee" of the use of this methodology]). If the evaluative materials before the CSE recommend a particular methodology, there are no other evaluative materials before the CSE that suggest otherwise, and the school district does not conduct any evaluations "to call into question the opinions and recommendations contained in the evaluative materials," then, according to the Second Circuit, there is a "clear consensus" that requires that the methodology be placed on the IEP notwithstanding the testimonial opinion of a school district's CSE member (i.e. school psychologist) to rely on a broader approach by leaving the methodological question to the discretion of the teacher implementing the IEP (A.M. v. New York City Dep't of Educ., 845 F.3d 523, 544-45 [2d Cir. 2017]). The fact that some reports or evaluative materials do not mention a specific teaching methodology does not negate the "clear consensus" (R.E., 694 F.3d at 194).

During the 2019-20 school year, the student's sixth grade special education teacher, who in addition to her State teaching certification also held a Master's degree in literacy, conducted the December 2019 learning evaluation of the student (see Tr. pp. 498-99; Dist. Ex. 32 at p. 1). For the 2019-20 school year, the special education teacher had all of the students in her 15:1 special class for instruction in ELA, mathematics, science, and social studies (see Tr. p. 500). For ELA, the special education teacher prepared lessons for "reading, vocabulary, writing, science, social studies and then mathematics" (id.). She followed the student's IEP annual goals and "then weaved in the [sixth] grade curriculum" (Tr. pp. 500-01). At the start of the 2019-20 school year, she assessed the student in the areas of reading, writing, and mathematics to "give [her]self a foundation of what we were going to begin working on as the year started" (Tr. pp. 502-03). Based on those assessments, the special education teacher testified that the student's "concrete math skills were pretty strong in terms of his math facts"; his writing was more challenging in terms of getting his ideas down and expanding on his writing length; and in terms of reading comprehension, the student definitely needed to work on this area (Tr. p. 503).

She testified that, as the school year progressed, the student's reading and decoding "definitely continued to improve" through the use of guided reading instruction (Tr. p. 504). In addition, the student's fluency improved and they "put in a lot of extra work" with respect to his reading comprehension skills (id.). She noted, however, that the student "responded well to the interventions that . . . were put[] into place" (id.). Prior to the school closures in March 2020, the special education teacher testified that the student had been "writing two paragraph essays on his own using the graphic organizer" (Tr. pp. 504-05). In mathematics, the student required "a lot of visual cues," and he was challenged by multistep problems, so there was "a lot of review and repetition" (Tr. p. 505).

With respect to reading instruction, the special education teacher explained that she would conduct a "full class reading lesson on whatever reading skills [the class was] addressing at the

time" (Tr. p. 506). Then, the class would work "in guided reading groups throughout the rest of the week" (Tr. pp. 506-07). She used "visualizing and verbalizing" for reading instruction, and she "would tie that into metacognitive reading instruction to really work on the comprehension and the imagery and the vocabulary piece" (Tr. p. 508). As a whole class for reading, the special education teacher, on Mondays, "would kick off one story a week with some kind of metacognitive skill, whether it [was] a word blast, . . . a listen and comprehension activity, a describe an object, build the vocabulary" just to get the students' "brains primed for the reading that [they] were going to be doing" (Tr. pp. 509-10). In addition, the special education teacher would "introduce a passage" and they would "tie that skills into the passage"; after reading the passage together, the class would then have an "activity following up where they would answer questions and [she] would meet with pockets of students individually" (Tr. p. 510). Thereafter, for the remainder of the week, the class worked on guided reading (id.).

More specific to the student in this case, the special education teacher testified that she used visualizing and verbalizing with him in his guided reading group (see Tr. p. 510). She explained that the program was "a lot of imaging and vocabulary," which was tied to the story, and after completing the story or lesson, the student would answer questions (id.). If the story or lesson was completed prior to the end of the school week, the special education teacher would use other books for guided reading instruction, and she "would build in a lot of decoding and fluency" (Tr. pp. 510-11). In addition, the special education teacher would "pull out unfamiliar words" or use "preset words" she had previously selected to work on the "decoding piece" (Tr. p. 511). The special education teacher testified that she tracked fluency and would tie comprehension questions to the stories read (id.). For the student's vocabulary goal in his IEP, the special education teacher addressed it "in terms of reading and nonfiction passages," but she also tied it to "science and social studies" by using "word blasts" (Tr. p. 513). She also used "concepts imagery" and "vocabulary mapping to build those skills" (id.).

During the COVID-19 pandemic, the special education teacher acknowledged that she posted work for the student using the visualizing and verbalizing program, but it was "very difficult for [her] to assess the decoding piece [during asynchronous instruction] because [she] was not able to hear him read or listen to him read at that time" (Tr. pp. 637-38). She also testified that any visualizing and verbalizing or metacognitive reading activities posted to her Google classroom could be viewed on that platform (see Tr. pp. 638-39).

With respect to the student's progress in reading in the 2019-20 school year, the special education teacher—referring to his annual goals progress report (see generally Dist. Ex. 40)— testified that he was "progressing satisfactorily with the exception of going back to a nonfiction text and answering comprehension questions," where she assessed him as progressing gradually (Tr. p. 523). Throughout the school year, the special education teacher monitored the student's progress "through guided reading in various different ways"; for decoding and fluency, she would conduct "fluency assessments weekly," which would provide her with an "overview of his decoding errors as well as his rate"—and she used that data to assess his progress; and in reading comprehension, she assessed his progress based on his "ability to answer comprehension questions based on the skill [they] were doing independently" (Tr. pp. 605-06). For vocabulary, the teacher assessed his progress by reviewing subject areas, such as social studies and science (see Tr. p. 606). She also noted that, given the COVID-19 pandemic in spring 2020, she continued to collect data on the student's progress, but it "looked a little bit different" (Tr. pp. 606-08). She also

testified that she did not have any concerns about the student's progress following the January 2020 CSE meeting (see Tr. pp. 608-09).

In reading, the special education teacher kept "running records," which reflected the student's errors when reading (i.e., missed words), the length of time it took the student to read a passage, and then she kept a chart of this data so that she could track his weekly progress and improvements (see Tr. p. 609). The student answered questions on worksheets, which allowed the teacher to collect data on his reading comprehension (see id.). She testified that the student made improvement in his literal comprehension skills but continued to need support in the area of "inferential comprehension as well as support in the area of vocabulary" (Tr. p. 613).

With reference to the student's below average reading scores on the December 2019 learning evaluation, the special education teacher testified that a discussion took place during an instructional support team meeting concerning whether the student needed "additional reading services"; at that time, it was decided that the student was "receiving the appropriate level of reading support" (Tr. pp. 614-15). With respect to the student's below average performance in the pseudoword decoding subtest, the special education teacher recalled that, because they were not "real words," it affected the student's performance, which brought down his overall reading scores (Tr. p. 615). She further explained that, although the use of pseudowords provided a measure to assess a student's decoding skills, she did not "feel and the team did not feel at the time that that was reflective of that aspect" for this student (Tr. p. 616). This was especially so because the student was more stressed by the fact that they were not "real words" (id.). When asked if she made an effort to improve the student's decoding skills during the 2019-20 school year, the special education teacher testified that the student was "receiving the appropriate level of reading instruction in the classroom and we felt based on what we were seeing in the classroom and through our committee discussion that he was receiving the appropriate level of reading support services at that time" (Tr. pp. 617-18). She also testified that, during the 2019-20 school year with respect to reading, she "worked in small groups" with "research-based programs," and "embedded research-bases strategies in terms to help support his decoding and fluency instruction" and then "tied it to activities paired with research-based programs for his comprehension" (Tr. p. 618). Thus, she indicated that the student's reading deficits were "remediated" during the 2019-20 school year (id.). More specifically, the special education teacher testified that that research-based programs that she used with the student included visualizing and verbalizing for reading comprehension; she used Orton-Gillingham strategies to address decoding "as it was embedded into his guided reading books" (Tr. pp. 618-19). She also noted that the student's "vocabulary and comprehension" were greater areas of concern for her (Tr. p. 620). She also testified that they "made the best academic decision we could for him at the time based on his progress" (id.).

The January 2020 CSE developed annual goals that targeted the student's ability to make inferences, summarize what he read, and identify missing words in a passage using context clues, skills that relate to reading comprehension (see Dist. Ex. 58 at p. 10). While the CSE did not explicitly address the student's decoding deficits, the information before the CSE, at that time, reflected that the student was making satisfactory progress toward his vocabulary and reading comprehension annual goals. Moreover, there was no information before the January 2020 CSE that the student required a particular methodology.

Turning to the later portion of the 2020-2021 school year when the CSE revisited the design of the student's programming, there is no indication that any member of the committee expressed

concern about the student's progress in reading or raised issue with the focus of the instruction he was receiving. At the impartial hearing, the student's special education teacher for ELA during the 2020-21 school year testified that he "often volunteered to read in class," whether it was a novel or a short story, and "he was confident about it and enjoyed reading to the class" (Tr. pp. 909-10). She also testified that the student "struggle[d] with vocabulary which impact[ed] his comprehension" (Tr. p. 910). She also testified that the student received "literacy" as a separate service during the 2020-21 school year (id.). With respect to ELA, the special education teacher testified that they worked on the seventh-grade curriculum, which included vocabulary, reading and fluency, writing a paragraph by breaking it down into "smaller units of information" or "[c]hunking" information (Tr. p. 911). The student's fluency needs were addressed by "modeling fluency for him when reading aloud" and providing opportunities "to read aloud to the class" and to discuss what happened in the story (Tr. p. 912). In addition, the student wrote in a journal to "take a deeper plunge into what[ wa]s going on in the stories" and to allow the students to voice opinions or feelings about the story (id.). The special education teacher also worked on vocabulary and "context clues," as well as providing the student with "activities" that could translate into "strategies" for the student to use (id.). For writing, the special education teacher used the "RACE writing strategy," which was an acronym for "restate, answer, cite and explain" and which the student used as a "formula to give a thorough answer to a question" (id.). According to the special education teacher, the student's reading comprehension skills improved from September 2020 through June 2021, as demonstrated by his ability to "respond to reading prompts"; "reading passages"; his ability to "restate the question in his answer"; and his ability to use strategies, such as context clues, to "understand the unknown vocabulary while he was reading" (Tr. p. 914).

The student's special education teacher also testified that, during her support class in the 2020-21 school year, she worked on the student's annual goals and reported on his academic annual goals (see Tr. pp. 972-74). She explained that in her ELA class with the student, she followed the seventh-grade curriculum "[a]s best we could," unless a particular novel was too difficult or the students would not be "engaged in learning" from that novel (Tr. pp. 975-76). She also testified that the ELA class worked on "reading and reading strategies," as well as "writing" and "learning new vocabulary" (Tr. pp. 976-77). In the support class, the special education teacher testified that she did not use "any specific or specialized reading program," but noted that the student received "literacy," where "they used specific programs for reading" (Tr. p. 978). She further explained that she used "[v]arious materials to work on his goals so there was direct instruction" and the opportunity to practice skills (Tr. pp. 978-79). When asked if she provided the student with "remedial reading support," the special education teacher testified that, within the student's 15:1 special class for ELA, he student received a "slower pace, modified, work, [and a] smaller group setting," and the support class at the end of the school day was for "reenforcing [sic], reviewing and working those IEP goals" (Tr. p. 981). She also testified on cross-examination that, during the 2020-21 school year, as the student's ELA, science, and support teacher that she observed signs that the student had a "profound reading disability," but that was why the student received "reading instruction" and why he was placed in a "self-contained classroom" with an IEP (Tr. p. 988).

#### 4. Speech-Language Therapy

As its cross-appeal, the district argues that contrary to the IHO's determination, the evidence in the hearing record established that the recommended speech-language therapy services for the 2020-21 school year were sufficient to meet his needs. In the decision, the IHO found that

the evidence in the hearing record did not explain the January 2020 CSE's decision to remove the student's individual speech-language therapy services given his significant needs. However, as asserted by the district, the hearing record provides sufficient evidence to support the CSE's decision to remove the individual speech-language therapy sessions.

As noted above, the district completed a December 2019 speech-language evaluation as part of the student's three-year mandated reevaluation process (see generally Dist. Ex. 30). At that time, the student demonstrated articulation skills on the GFTA-3 that fell within the average range (SS, 109) at the single word level (id. at pp. 2, 4). At the impartial hearing, the student's speech-language provider for the 2019-20 school year—who had been the student's speech-language provider since kindergarten—explained that, when she had last evaluated the student in 2017, the student achieved a standard score of 67 on the GFTA-3, which was "significantly below average" and which had indicated that the student was "struggling significantly to articulate sound" (see Tr. pp. 419-20, 428-29; Dist. Ex. 23 at pp. 3, 6). She noted that articulation had "many facets," including an "oral motor component" and a "phonological component," and that the student had been previously diagnosed as having "generalized dyspraxia" (Tr. pp. 428-30). Overall, as a result of her 2017 speech-language evaluation, which included an informal oral motor assessment in addition to administration of the GFTA-3, the speech-language provider stated that she had no concerns regarding the student's "oral motor area" (Tr. p. 431).[24] The speech-language provider testified that she had attended a previous CSE meeting in January 2019, which resulted in the development of the student's IEP for the 2019-20 school year (see Tr. pp. 432-34). She testified that, at the time of the January 2019 CSE meeting, the student was "doing significantly better from 2017 to 2019," and at the January 2019 CSE meeting, she modified the student's speech-language therapy services to include five 6-minute sessions per week of individual speech-language therapy ("rapid drills") to specifically target the student's need to generalize his remaining articulation errors into conversational speech and the change in services was an attempt to "try and remediate that" (Tr. pp. 434-36; see Dist. Ex. 1 at pp. 1-2). In the January 2019 IEP, the speech-language provider retained the student's group sessions of speech-language therapy because, within a group setting, the student could "learn and practice his language goals with other peers," and he could transfer what he had learned in his "rapid drills" to "conversation with peers" (Tr. pp. 436-37).

Turning to the December 2019 speech-language reevaluation, the speech-language provider testified that she had continued providing services to the student after the development of his January 2019 IEP (see Tr. p. 442; see generally Dist. Ex. 30). At the time of the January 2020 CSE meeting to develop the student's IEP for the 2020-21 school year, the speech-language provider testified that the student was doing "quite well" and "he was mastering or moving towards mastery" of all of his annual goals in the January 2019 IEP (Tr. p. 443). She also explained that she did not administer as many subtests from the CELF-5 to the student as part of the December 2019 speech-language reevaluation because she had "an additional three years to work" with the student and she "had a very solid knowledge of where his strengths and weaknesses" existed (Tr. p. 444; see Dist. Ex. 30 at p. 1-2). On the CELF-5 core language composite, the student achieved

---

[24] The January 2017 speech-language evaluation report included the results of an informal oral motor analysis conducted by the speech-language provider (Dist. Ex. 23 at pp. 1, 6). The provider's oral motor analysis revealed the student had "adequate lingual strength and range of motion for extension, elevation, depression and lateralization" (Dist. Ex. 23 at p. 6). The analysis further revealed that the student "was able to demonstrate labial extension and retraction" and that his "diadochokinetic rate was adequate" (id. at p. 6).

a standard score of 79, which the speech-language provider characterized as a "moderate deficit" without having access to a "bell curve in front" of her (Tr. pp. 444-45; see Dist. Ex. 30 at p. 1). She explained that, when compared to the student's previous evaluation results, the student's standard score of 79 was "actually a very solid score, showing a nice improvement" because even though that score improved by one point, the student "had to keep in line with the standardization of that assessment for a child that [wa]s now three years older"—so he "made some nice solid growth over that time" (Tr. p. 445). Within the classroom, the student's reevaluation results indicated that he was "continuing to have some deficits in the area of language both receptive and expressive" (Tr. p. 447). With respect to the student's results on the GFTA-3, the speech-language provider testified that his score—a 109—fell "solidly within the average range" and showed "nice growth" (Tr. pp. 447-48; see Dist. 30 at p. 1). However, the speech-language provider found it noteworthy to explain within the December 2019 speech-language evaluation that the student, while receiving an "excellent" articulation score, continued to present with difficulty articulating new or unfamiliar words and that "therapy really would focus or continue to focus on teaching him what we would consider word attack skills, compensatory strategies, ways to help himself so that" when he encountered new words in content areas, he would have support (Tr. pp. 448-49).

With respect to the January 2020 CSE meeting, the speech-language provider testified during the impartial hearing in December 2023 that she did not have a "recollection of the actual meeting," but she explained how she would otherwise report on the student's progress on his annual goals and then provide recommendations for services (Tr. pp. 451-52; see generally Dist. Exs. 2-3; 58). She confirmed that, as part of the December 2019 speech-language evaluation, she had drafted annual goals for the 2020-21 school year, which would have been presented on a draft IEP (see Tr. p. 452; Dist. Ex. 30 at p. 2). By the time of the January 2020 CSE meeting, the student was "making progress toward his mastery of his IEP goals if not having had mastered some at that point in time already" (Tr. p. 453; see Dist. Ex. 40 at pp. 5-6).

On cross-examination, the speech-language provider confirmed that, based on the student's 2017 speech-language evaluation results, he required "speech and language therapy to address his deficit areas, speech articulation therapy and language therapy"—however, she did not confirm that the student required "intensive speech-language services" at that time (Tr. p. 464). Rather than characterizing the student as needing "intensive speech and language therapy," the speech-language provider described "intensive" as "term that [wa]s interpreted," and she preferred to phrase the student's need as a need for "appropriate speech and language intervention," which was what she delivered with the five 6-minute sessions per week and two group sessions per week of speech-language therapy (Tr. p. 465). She also testified that, for the 2020-21 school year, her recommendations for the student's speech-language therapy changed from the services delivered during the 2019-20 school year because the student was then at a "level where he needed to now embed his skills, particularly in the area of articulation, into group learning" (Tr. p. 482; see Tr. p. 578). She explained that the student had received a standard score of 109 on the GFTA-3—in the average range—and he needed to use those skills with peers in a more "naturalistic setting" (Tr. p. 482). She also testified that "group instruction" would have been "most appropriate and group [sessions] on alternating days was actually deemed to be an increase in time because they [we]re 42 minute blocks on alternating days" (Tr. 482). According to the speech-language provider, the services changed because the student's needs had changed (see Tr. p. 579). More specifically, she explained that the student no longer needed the "six-minute drills" because he was "at a level where he was practicing the skills or should have been practicing the skills with peers in conversation so

group at that time would have met his needs" (Tr. p. 579). In addition, she testified that the six-minute drills were "removed" from the student's IEP for the 2020-21 school year because "they were no longer necessary," as the student was "developmentally at the level where he needed to now practice those with peers and that was the basis for" the removal (Tr. pp. 586-87).

Based on the foregoing evidence, the IHO erred by finding that the hearing record lacked evidence to explain why the district modified the student's speech-language therapy services for the 2020-21 school year.

Next, the district argues that the IHO erred by finding that, although the December 2020 CSE added individual speech-language therapy to the student's IEP, the evidence in the hearing record failed explain how the recommended speech-language therapy services were intensive, as recommended in the October 2020 psychological diagnostic evaluation.

As previously noted, at the December 2020 CSE meeting, the CSE discussed the parents' concern that the student was not making progress in his speech and language skills, but instead, was regressing, and requested individual speech-language therapy services on alternating days or at least two sessions per week based on the recommendation in the October 2020 psychological diagnostic evaluation report for "'intensive speech and language therapy'" (see Dist. Exs. 4 at pp. 1-2; 36 at p. 8). At the meeting, the district members of the committee did not agree with the parents' assertion that the student was regressing in his language skills and pointed to progress monitoring on the student's annual goals, which he had achieved in Spring 2020 (see Dist. Ex. 4 at p. 2). In addition, the student's then-current speech-language provider who attended the December 2020 CSE meeting indicated that the student could "answer yes or no questions, but ha[d] limited vocabulary"; she did, however, recommend two additional annual goals to address the student's vocabulary and multiple meaning words, and to address his use of the past tense in sentences (id.). The CSE also discussed the student's pragmatic language needs and added another annual goal to address "body language" (id.). Overall, the student's speech-language provider did not believe that the student required individual speech-language therapy, but instead, believed that the student's speech-language needs could be addressed through the group speech-language therapy sessions already in place (id.).

In addition, the December 2020 IEP reflects that "[s]taff [we]re not recommending" individual speech-language therapy (Dist. Ex. 4 at p. 2). At that time, it was reported that the student "ask[ed] questions but need[ed] redirection for his attention," he required a "review of topics," and he already received "instruction in language concepts in other special education classes" (id.). Nevertheless, to take into account the parent's concerns the CSE chairperson proposed a compromise to address the disagreement and added one session per week of individual speech-language therapy services to the student's IEP for the remainder of the 2020-21 school year (id. at pp. 1-2).

At the impartial hearing, the December 2020 CSE chairperson testified the CSE initially reviewed and discussed the results of the October 2020 speech-language evaluation conducted by the student's then-current speech-language provider (see Tr. pp. 108-09; Dist. Ex. 37 at p. 1). The CSE chairperson testified that while the student exhibited "language weaknesses," the student's scores were consistent with his previous evaluation results (Tr. pp. 110-11, 115-17). The December 2020 CSE also reviewed the October 2020 psychological diagnostic evaluation and the letter submitted by the student's nurse practitioner, and considered input from the student's then-

current teachers in attendance at the meeting, as well as the student's parents (see Tr. pp. 111-14; Dist. Exs. 35-36). The CSE chairperson testified that when the parents expressed concern about regression of the student's language skills, the CSE did not have any data indicating that the student was regressing (Tr. p. 115). Instead, the October 2020 speech-language evaluation results had been consistent with previous evaluations, especially with regard to the CELF-5, and the progress monitoring of the student's annual goals did not indicate regression (see Tr. p. 115). According to the CSE chairperson's testimony, the CSE added one individual session per week of speech-language therapy based on the parents' concerns, and based on the parents' understanding that the recommendation for "intensive" speech-language therapy meant individual sessions (Tr. pp. 115-16). The CSE chairperson explained that, while the individual speech-language therapy was not recommended based on the October 2020 speech-language therapy evaluation, "there [wa]s other input [at the meeting] and this could benefit the student" (Tr. pp. 116-17).

With regard to the student's communication skills as reflected in the Vineland-3, the December 2020 CSE chairperson testified that, although the CSE read through the October 2020 psychological diagnostic evaluation report, as well as the evaluator's diagnoses and recommendations, he did not specifically recall reviewing the results of the Vineland-3 in the area of communication (see Tr. pp. 145-46). Notwithstanding that the student's communication skills fell in the less than the first percentile range, the December 2020 CSE chairperson explained that the "percentile [wa]s based solely on a parent questionnaire," and that it was not a "standardized special indication evaluation form for speech language" (Tr. p. 146). He further noted that, typically, a Vineland included "both parent and teacher responses" (Tr. pp. 146-47). In addition, the witness testified that, while not suggesting that the Vineland-3 results were not legitimate, he described it as a "far less valuable data . . . than the standardized measure that was conducted through the speech and language evaluation"—clarifying that the Vineland-3 was not a "standardized speech and language evaluation" (Tr. p. 147).

With respect to the recommendations for "intensive" speech-language therapy services, the December 2020 CSE chairperson testified that, although he did not "always consider" two sessions per week of group speech-language therapy services to be "intensive," he also thought that the term "intensive" was "relative" (Tr. p. 153). He also did not consider the recommendation for intensive speech-language therapy in the October 2020 psychological diagnostic evaluation to "necessarily mean an increase in speech and language" services (Tr. pp. 153-54). The CSE chairperson also testified that the CSE did not "depart" from the recommendation in the evaluation report, but rather, the CSE "considered the input of all the committee members" as well as the recommendations, and upon further discussion, agreed to increase the student's speech-language therapy services by adding an individual session (Tr. p. 154). He explained that, for a student who was already receiving speech-language therapy services "every other day," the added individual session was an "increase in intensity" (Tr. p. 154). He clarified that he did not know if the evaluator "had a specific recommendation in mind" (Tr. p. 155). The CSE chairperson also testified that even though he did not seek clarification about the evaluator's recommendation directly from the evaluator, the CSE "had the conversation" about whether the speech-language therapy services were "intensive enough" (Tr. p. 155). As mandated in the December 2020 IEP, the student would receive 42-minute sessions of speech-language therapy on "six out of every 10 days" (Tr. p. 168; see Dist. Ex. 4 at p. 1).

The student's speech-language therapist during the 2020-21 school year also testified at the impartial hearing (see Tr. pp. 659, 663-64). The student's group therapy sessions included a total of three students, and during those sessions, the student worked on his annual goals (see Tr. pp. 663-64). With respect to the recommendation for speech-language therapy services in the December 2020 IEP, the speech-language provider testified that she "felt that alternating days for 42 minutes was sufficient to meet [the student's] needs and work on his goals and that he could accomplish those goals in a group setting" (Tr. p. 725).[25]

Based on the foregoing, the evidence in the hearing record supports the district's argument that the IHO erred by finding that the district failed to recommend sufficient speech-language therapy services to meet the student's needs. As a result, the IHO's conclusion that the district failed to offer the student a FAPE for the 2020-21 school year must be reversed.

### B. 2021-22 School Year (June 2021, September 2021, October 2021, March 2022 IEPs)

The CSE reconvened on June 8, 2021 for an annual review to develop the student's IEP for the 2021-22 school year (Dist. Ex. 5 at p. 1). The IEP summary noted that the parents were having the student evaluated by a neuropsychologist and a "speech and language specialist" and the CSE would reconvene when the evaluations and reports were completed (id. at p. 2). The CSE relied on evaluations from 2019 and 2020, and input from the student's then current providers and parents who were present at the meeting (Dist. Exs. 5 at p. 3; 17 at p. 1). The June 2021 CSE found the student continued to be eligible for special education as a student with autism and recommended that the student attend a 15:1 special class (consisting of five periods per week of social studies, five periods per week of science, seven periods per week of math, and seven periods per week of ELA) and receive one 42-minute session per week of group speech-language therapy on alternate days; one 42-minute session of individual speech-language therapy per week; two 30-minute sessions of individual counseling per month; and one 60-minute session of individual parent counseling and training per quarter (Dist. Ex. 5 at pp. 1, 9-10).[26]

The CSE reconvened on September 23, 2021 as requested by the parents to review the private evaluations results and "consider amendments to the IEP" (Dist. Ex. 6 a pp. 1-2). The hearing record shows that the September 2021 CSE relied on results of the parents' June 2021 neuropsychological and speech and audiology evaluations, parent input, the student's then current providers input, and the student's final grades from the 2020-21 school year (Dist. Exs. 6 at pp. 2-4; 18 at p. 3). The CSE continued the programming recommendations from the June 2021 IEP

---

[25] At the impartial hearing, the student's special education teacher for ELA in seventh grade testified that the student's annual goals for speech-language therapy addressed needs similar to those he had in academics, such as "vocabulary or multiple meaning words, inferencing," and that those deficits were "present in the classroom as well" (Tr. p. 915). Nevertheless, the special education teacher explained that "because [the student] was in a modified program that was a slower pace, he was appropriately placed"; she further noted that the student did "well with the slower pace and the smaller group setting and the modified curriculum"; he completed assignments; he participated in class; and he was able to learn (Tr. p. 916).

[26] For summer 2021, the CSE recommended four 45-minute sessions of resource room per week, one 30-minute session of individual speech-language therapy per week, and one 60-minute session of parent counseling and training (Dist. Ex. 5 at p. 11).

except that the CSE added an additional individual session of speech-language therapy per week to the student's programming and removed one weekly period of the 15:1 special class for ELA (compare Dist. Ex. 6 at pp. 12-13, with Dist. Ex. 5 at pp. 9-10). The CSE reconvened again on October 21, 2021, and, in response to the parents' request, increased the recommendation for parent counseling and training to 12 60-minute individual sessions per year and added a recommendation for five 30-minute team meetings per year with the parents and rotating school staff (Dist. Ex. 7 at pp. 1-3, 11-12). Finally, the CSE reconvened on March 31, 2022 and added a recommendation for access to a frequency modulated (FM) system for the student, an accommodation for extra time to use a single use bathroom, and an additional session of parent counseling and training for the year (Dist. Ex. 8 at pp. 1-3, 13-14).

### 1. Student's Progress from Prior School Year

As noted above, it is well settled that a student's progress under a prior IEP is a relevant area of inquiry for purposes of determining whether an IEP has been appropriately developed, (see H.C., 528 Fed. App'x at 66-67; Adrianne D., 686 F.Supp.2d at 368; M.C., 2008 WL 4449338, at *14-*16; see also "Guide to Quality Individualized Education Program (IEP) Development and Implementation," at p. 18).

Here, the student's final report card for the 2020-21 school year (seventh grade) reflected that the student passed all courses with the following final grades: English 86, math 84, social studies 82, science 85, health 89, home and careers 94, technology 91, physical education 96, and literacy "pass" (Dist. Ex. 44). The student's annual goals progress report for the 2020-21 school year showed that, in reading, the student achieved a reading goal that targeted his ability to write a summary of an article or story and made "good progress" but would continue to work on goals that addressed his ability to identify missing words in a passage using context clues and to make inferences about a character's actions and/or story events (Dist. Ex. 41 at p. 2). In writing, the student achieved a goal related to creating a four-paragraph essay using a graphic organizer and made progress on his goal to add elaborations to his writing assignments but would continue to need support in this area (id. at p. 3). According to the progress report, in math, the student achieved a goal that targeted his ability to analyze, interpret, and answer questions about data from a graph, and made gradual progress during the first three quarters on a goal that targeted his ability to solve mathematical problems involving three steps and would continue to work on the goal during the next school year (id. at p. 4). In addition, the student achieved three out of four of his speech-language goals including those related to articulation, understanding irregular past tense verbs, and explaining or demonstrating body language or nonverbal behavior that would impact a conversation (id. at pp. 5-6). The progress report indicated that the student made progress but would continue to work on a goal related to understanding multiple meaning words (id. at p. 5). Finally, the progress report showed that the student achieved his counseling goal related to identifying solutions to a hypothetical stressful situation (id. at p. 6).

With respect to the student's progress during the 2020-21 school year, the evaluator who conducted the June 2021 neuropsychological evaluation reported information from the parents that the student "had a very challenging year" due to the transition to the middle school building but that towards the end of the school year he "had begun to warm up to the new setting" (Dist. Ex. 39 at p. 5).

## 2. Supports for Executive Functioning

The parents assert that, notwithstanding recommendations in the June 2021 neuropsychological evaluation for integration of executive functioning supports and daily 1:1 instruction, the CSEs failed to recommend executive functioning instruction. In addition, the parents argue that the recommendation for counseling was not sufficient and that the executive functioning goal was not, in fact, addressed during counseling. The parents contend that to address the student's executive functioning needs, the student required a class size of no more than 10 students.

The September 2021 CSE considered the June 2021 neuropsychological evaluation, and the evaluator who conducted the neuropsychological evaluation attended the meeting to discuss the assessment (see Dist. Ex. 6 at pp. 1-4). In the June 2021 neuropsychological evaluation report, the evaluator described that the student did well on tasks measuring cognitive flexibility, planning and organization, and sustained auditory attention, but struggled with sustained visual attention and demonstrated weak impulse control (Dist. Ex. 39 at p. 26). In particular, on the Conners' Continuous Performance Test 3rd Edition (CPT-3), the evaluator reported that the student's overall "mean response speed" was average and consistent across the duration of the activity, but he had "a significant reduction in response speed as the assessment progressed" and these results "strongly indicate[d] difficulty with sustained visual attention (id. at p. 18). Administration of the Conners Continuous Auditory Test of Attention to the student yielded results indicating "secure sustained auditory attention" (id.). The student received a score in the "superior range" on the Wisconsin Card Sorting Test (WCST) which suggested that "his ability to shift mindset and problem solve efficiently fell above age-based expectations" (id.). On the Delis-Kaplan Executive Function System (D-KEFS), the report indicated that the student's overall achievement score fell "within expectations" (id.). Finally, the student's performance on a speeded measure of response inhibition was variable, with his performance falling within expectations until task demands increased, at which point his performance fell below expectations; the evaluator noted that, although the student "was encouraged to slow down to ensure correctness, . . . he appeared focused upon how fast he could finish the task" (id. at pp. 18-19). The parents and the student's teacher completed various behavioral measures, and the parents reported a high degree of inattention and additional symptoms of impulsivity and hyperactivity, whereas the classroom teacher did not report such concerns to the same degree (id. at pp. 19-20).[27]

The evaluator made several recommendations in her report which included a classroom placement "specifically designed to educate students with significant executive functioning deficits," and small in size (no more than 10 students) (Dist. Ex. 39 at p. 28). In addition, the evaluator recommended "integration of executive functioning supports" as well as a daily "dedicated period to work 1:1 with an educator to learn compensatory strategies" (id. at pp. 27, 28).

---

[27] During the impartial hearing, the evaluator explained the disparity in the parents' and teacher's reports regarding the student's inattention and hyperactivity, noting that such discrepancy was not uncommon, and could be for various reasons such as: "the high degree of structure that is present in a classroom," and the fact that "parents see one child . . . at home so they're able to focus more directly than a teacher who is. . . trying to gather information about multiple students" (Tr. p. 1849; see Dist. Ex. 39 at p. 19).

The results from the June 2021 neuropsychological evaluation were reflected in the meeting minutes of the September 2021 CSE meeting, including information regarding the parents' concerns about the student's inattention, some milder concerns with hyperactivity/impulsivity, all areas of adaptive skills, and difficulty understanding his homework assignments (Dist. Ex. 6 at pp. 2-4). The minutes noted the evaluator's clinical recommendations for supporting the student's attention with a "more flexible approach" with targeted interventions, scaffolding of lessons, and integrating executive functioning in a small class (id. at p. 3).

The CSE chairperson for the CSE meetings that occurred during the 2021-22 school year indicated that the CSE considered the recommendations in the neuropsychological evaluation relating to the student's executive functioning and did not "depart from the [evaluator's] recommendations" but, instead, discussed the program and services and developed the plan with the evaluator's input (Tr. pp. 310, 312). She indicated that the district did not have a classroom with 10 students, but it did have one with 15 students, and there was "careful consideration of all team members and their input" (Tr. p. 312). In her testimony, the CSE chairperson reviewed the subtests that the evaluator had used, highlighting the student's strengths on multiple executive function measures but noting that, when the student "sped up, he made more errors" (Tr. p. 317). She reported that the CSE looked at the information available "as a whole," including the results of the June 2021 neuropsychological evaluation, teacher reports, previous assessments, and the student's functional performance in school (Tr. pp. 317-18).

With respect to supports for executive functioning, the CSE chairperson indicated that there was discussion at the CSE meeting with the teachers who shared that the student "ha[d] access to . . . a Google classroom where the homework [was] posted and he [had] been taught how to go to the Google classroom and open that" and the team discussed the "work that they [did] in the additional 15-1 block periods to support his breaking down assignments, organizing information, and preparing to study for tests" (Tr. p. 217). The CSE chairperson testified that the CSE discussed how some aspects of the student's executive functioning could be addressed "within a counseling component" (Tr. p. 214). The CSE developed an annual goal for the student to create a plan to accomplish a task that he identified as difficult (Tr. p. 214; Dist. Ex. 6 at p. 12). The CSE chairperson testified that, while the student's counselor would be "responsible for the oversight of this particular goal," there could be "some input from his other teachers" (Tr. pp. 218, 220).[28]

During the impartial hearing, the evaluator testified that the student had the "skill set in many instances but he struggle[d] to transfer it to be successful accomplishing age-appropriate tasks" and she attributed this to a lack of "explicit instruction in executive functioning" (Tr. p.

---

[28] The parents allege that the counseling goal was not implemented as intended, as the student's counselor testified that the student's executive functioning goal was being worked on by "other providers" (Tr. pp. 820-21, 823-24). The hearing record shows that the annual goal was addressed by the student's special education teacher and the school psychologist during the 2021-22 school year (see Dist. Exs. 7 at p. 2; 8 at p. 2). Having a different provider implement the goal is not, in and of itself, a violation of the IDEA, as "[g]oals are developed for the student, not the service provider" ("Questions and Answers on Individualized Education Program (IEP) Development, The State's Model IEP Form and Related Requirements," at p. 22, Office of Special Educ. Mem. [Updated Oct. 2023], available at https://www.nysed.gov/sites/default/files/programs/special-education/questions-answers-iep-development_0.pdf).

1851). In her testimony, she stated that the student lacked "consistent access to help him pull his skills slowly but surely to tackle and successfully approach day-to-day tasks" (id.).

The evaluator explained that, because the student "performed very well on certain things in a one-on-one situation" but also needed to "be part of a cohort to expand his peer interactions," she recommended a small class (Tr. p. 1862). She further indicated that she recommended a class size of 10 because, in her view, that provided "the sweet spot for him" in terms of his access to peers while also "compensat[ing] for those attention deficits" and "executive functioning challenges" (Tr. pp. 1862-63). She testified that it would be more difficult to accommodate for the student's "significant visual attentional deficits" in a class "much larger" (id.). With respect to the class size recommended by the CSE, the evaluator testified that 15 students "fe[lt] big" (Tr. pp. 1863-64).

With respect to the recommendation for the student to work with a 1:1 educator to learn compensatory strategies, the evaluator testified that this was to address the "gap" between the student's robust performance on the WCST and D-KEFS and his functional executive functioning abilities, such as his struggle "to plan and organize things" in a real-life situation (Tr. p. 1865). The evaluator opined that the student required "direct explicit instruction on generalizing those executive functioning tasks" (Tr. pp. 1865-66). The evaluator characterized the CSE's plan to provide executive functioning support in two 30-minute sessions of counseling per month as "negligent" and indicated that would not "make a dent" (Tr. p. 1867). The evaluator further testified that she recommended an educator to work with the student on executive functioning skills because an educator would have "an understanding of the . . . intersection between executive functioning and academic tasks," such as those tasks "that are required to do homework, organize a backpack, organize a paragraph, those types of things" (Tr. p. 1868). She indicated that, "based on [her] knowledge," a counseling provider would not "have an explicit integration of executive functions as a construct" (id.).

Despite the recommendations of the private evaluator for a smaller class and 1:1 sessions with an educator to focus on executive functioning, as summarized above, the CSE had before it information reflecting that the student had received benefit and made progress during the 2020-21 school year from a program similar to that program recommended by the September 2021 CSE. Further, while the CSE was required to consider reports from privately retained experts, it was not required to adopt their recommendations (see, e.g., Mr. P. v. W. Hartford Bd. of Educ., 885 F.3d 735, 753 [2d Cir. 2018]; G.W. v. Rye City Sch. Dist., 2013 WL 1286154, at *19 [S.D.N.Y. Mar. 29, 2013]; C.H. v. Goshen Cent. Sch. Dist., 2013 WL 1285387, at *15 [S.D.N.Y. Mar. 28, 2013]; T.B. v. Haverstraw-Stony Point Cent. Sch. Dist., 933 F. Supp. 2d 554, 571 [S.D.N.Y. 2013]; Watson v. Kingston City Sch. Dist., 325 F. Supp. 2d 141, 145 [N.D.N.Y. 2004] [noting that even if a district relies on a privately obtained evaluation to determine a student's levels of functional performance, it need not adopt wholesale the ultimate recommendations made by the private evaluator], aff'd, 142 Fed. App'x 9 [2d Cir. July 25, 2005]). In addition to a 15:1 special class for core academic subjects, the executive functioning annual goal, and counseling services, the September 2021 IEP also addressed the student's needs related to attention and executive functioning by specifying that the student required some subjects to be taught in a small teacher-to-student ratio with minimal distractions, organizational strategies, directions explained and broken down for understanding, highlighting of key information by classroom teacher in directions

or assignments, visual cues to support instruction, and access to a computer (Dist. Ex. 6 at pp. 10, 12-13).

Based on the foregoing, although the CSEs did not adopt the parent's preferred approach to address the student's executive functioning, the evidence in the hearing record does not show that the CSEs that met to engage in educational planning for the student for the 2021-22 school year failed to address executive functioning needs in a way that would lead to a denial of a FAPE to the student.

### 3. Reading Instruction

The parents allege that the IHO erred in relying on the district's delivery of AIS services to conclude that the IEPs developed for the 2021-22 school year were appropriate. State regulations define AIS—which are available to both disabled and nondisabled students—as "additional instruction which supplements the instruction provided in the general curriculum" (8 NYCRR 100.1[g]; see 8 NYCRR 100.2[ee]). State regulation specifically contemplates that AIS be made "available to students with disabilities" provided that such services are provided in a manner consistent with the student's IEP (8 NYCRR 100.1[g]). To be clear, certain additional instructional or supportive services may be available to special education students and non-disabled students alike (e.g., AIS or "building level services"), and according to the State Education Department, such general services should not be listed on a student's IEP (see "Academic Intervention Services: Questions and Answers," at pp. 5, 20, Office of P-12 Mem. [Jan. 2000], available at http://www.p12.nysed.gov/docs/AISQAweb.pdf). But if a component of the AIS is provided to a student with a disability and that aspect of the service meets the definition of "specially designed instruction" under IDEA, the United States Department of Education's Office of Special Education Programs has clarified that services that clearly fall into the realm of special education are required to be listed on an IEP, stating in particular that "[t]he IEP Team is responsible for determining what special education and related services are needed to address the unique needs of the individual child with a disability. The fact that some of those services may also be considered 'best teaching practices' or 'part of the district's regular education program' does not preclude those services from meeting the definition of 'special education' or 'related services' and being included in the child's IEP" (Letter to Chambers, 59 IDELR 170 [OSEP 2012]; see Bd. of Educ. of Uniondale Union Free Sch. Dist. v. J.P., 2019 WL 4315975, at *12 (E.D.N.Y. Aug. 23, 2019), adopted at, 2019 WL 4933576 [E.D.N.Y. Oct. 7, 2019]; Urbandale Community Sch. Dist., 70 IDELR 243 [SEA Iowa 2017] [noting that "[i]nstruction becomes special education when it is designed or selected to meet the disability-related needs of an individual student and is necessary for that student to maintain or improve educational performance"]).

Here, the June 2021 private neuropsychological evaluation report included recommendations that the student have "[a]ccess to daily reading/spelling remediation using Orton-Gillingham programming" (Dist. Ex. 39 at p. 28). During the September 2021 CSE meeting, the student's literacy/reading teacher reported that the student was working on comprehension, but the committee considered that, "based upon his performance on reading measures," the student may benefit from "more targeted interventions" to address "his basic reading or decoding skills" (Dist. Ex. 6 at p. 3).

The CSE chairperson testified that, in consideration of the neuropsychological evaluation and the committee's view that the student required more "direct instruction in explicit reading

instruction," the CSE recommended that the student's annual goals be "written in that fashion so that he would have explicit instruction in decoding and encoding" (Tr. pp. 214-215). Consistent with this testimony, review of the September 2021 IEP reflects that the CSE added an annual goal, which provided that "[w]hen given explicit, sequential, instruction in reading and provided with controlled text aligned to his instructional level, [the student] will use learned strategies to decode words" (compare Dist. Ex. 6 at pp. 10-11, with Dist. Ex. 5 at p. 8). The CSE chairperson testified that the reading teacher would be responsible for implementing the goal (Tr. p. 226). She further indicated that, other than changing the focus of reading instruction, the addition of the annual goal did not "necessarily" mean that the student's program would change (Tr. pp. 226-27). With respect to the "learned strategies referenced in the annual goal, the CSE chairperson testified that the committee "agreed to use the Wilson Reading Program specifically and use those strategies to teach [the student] to read" (Tr. p. 225). She indicated that the student would get instruction in reading "in a lot of areas" including his special classes that would work on the student's reading and comprehension but that the student's reading class would have a "primary emphasis . . . on the decoding" (Tr. pp. 225-26). The IEP did not include a separate recommendation for specialized reading instruction as a special class, resource room, or other program or services available on the continuum of special education services (see generally Dist. Ex. 6; see also "Questions and Answers on Individualized Education Program (IEP) Development, The State's Model IEP Form and Related Requirements," at p. 31, Office of Special Educ. Mem. [providing that specialized reading instruction could be recommended in the IEP of the student as a special class, direct consultant teacher service, related service, resource room program]).

At the October 2021 CSE meeting, the reading teacher shared that she continued to work on comprehension with the student (Dist. Ex. 7 at p. 2). The committee discussed that the student's "reading group should change to a multisensory reading group-explicit, sequential reading instruction" (id.). The committee considered adjourning the meeting to confirm with "the building administration" when the reading group would occur (id.). The CSE chairperson testified that the oversight occurred because the school was "working on changing the providers to ensure that [they] had a provider who had appropriate training to administer the decoding program," and the student began the program immediately after the October 2021 CSE meeting (Tr. pp. 244-45).

I agree with the parents that evidence that the specialized reading instruction was provided to the student via AIS or in a small literacy class may not be relied upon to find the student's IEPs for the 2021-22 school year appropriate in that such a program or service was not included on the IEPs. The Second Circuit has held that retrospective testimony about actions a school district would have taken to address a student's needs may not be relied upon to rehabilitate a deficient IEP, as "[a]t the time the parents . . . choose whether to accept the school district recommendation or to place the child elsewhere, they have only the IEP to rely on" (R.E., 694 F.3d at 186). Here, however, even though the IEPs were not specific regarding the particular class or setting in which the student's reading would be addressed, in this instance, the IEPs as a whole, including the annual goal with its reference to the student's receipt of explicit, sequential instruction in reading, were reasonably calculated to enable the student to receive educational benefit in light of his circumstances.

Moreover, I note that in this instance the parents did accept the recommendations of the CSEs, and the student attended the district program. Thus, even if the IEPs were deficient for failing to specify a program or service for the specialized reading instruction, there is no dispute

that the student received instruction from a reading teacher during the 2021-22 school year after the October 2021 CSE, and the question would then become what relief, if any, would be warranted. On this point, although evidence that the student attended an AIS or literacy class during the 2021-22 school year may be retrospective when assessing the appropriateness of the IEPs, it would be relevant to consider in crafting an award of compensatory education (see N. Kingston Sch. Comm. v. Justine R., 2014 WL 8108411, at *9 [D.R.I. Jun. 27, 2014] [finding that a request for compensatory education "should be denied when the deficiencies suffered have already been mitigated"], adopted, 2015 WL 1137588 [D.R.I. Mar. 12, 2015]; Phillips v. Dist. of Columbia, 932 F. Supp. 2d 42, 50 [D.D.C. 2013] [finding even if there is a denial of a FAPE, it may be that no compensatory education is required for the denial either because it would not help or because the student has flourished in the student's current placement]).

This brings me to the parents' primary contention relating to the reading instruction, which relates to the district's implementation of the instruction using Wilson methodology. The parents argue that, when the CSE reconvened in October 2021, the student had not yet received instruction necessary for implementation of the decoding goal. Further, even after the student started receiving reading instruction from the reading instructor in October 2021, the parents allege that the instructor did not implement Wilson instruction with fidelity.

With regard to the implementation of a student's IEP, a denial of a FAPE occurs if there was more than a de minimis failure to implement all elements of the IEP, and instead, the school district failed to implement substantial or significant provisions of the IEP (Houston Indep. Sch. Dist. v. Bobby R., 200 F.3d 341, 349 [5th Cir. 2000]; see also Fisher v. Stafford Township Bd. of Educ., 289 Fed. App'x 520, 524 [3d Cir. Aug. 14, 2008]; Couture v. Bd. of Educ. of Albuquerque Pub. Schs., 535 F.3d 1243 [10th Cir. 2008]; Neosho R-V Sch. Dist. v. Clark, 315 F.3d 1022, 1027 n.3 [8th Cir. 2003]).

To the extent the district did not work with the student on the decoding annual goal included in the September IEP until after the October 2021 CSE meeting, I do not find that this delay constitutes a substantial or significant deviation from the IEP given evidence that the student was working on other areas of need at that time, including comprehension. Further, as to the parents' allegations about the district's implementation of the Wilson Reading Program, because the IEP did not identify that the student required instruction using a particular methodology, the parents' concerns about the implementation are not tethered to the IEP (see Y.F. v. New York City Dep't of Educ., 659 Fed. App'x 3, 5-6 [2d Cir. Aug. 24, 2016]).

Nevertheless, the evidence in the hearing record demonstrates that the reading instruction delivered to the student during the 2021-22 school year was tailored to meet the student's needs and that the student received educational benefit.

During the impartial hearing the reading instructor was asked to review her credentials and stated that, in addition to her 40 years of experience teaching special education and reading, she had received multiple trainings in multisensory reading programs (Tr. pp. 1339-42). She testified that she was able to teach the Wilson program with fidelity and added strategies as needed "to help kids learn skills that . . . need to be taught in a little different way" (Tr. p. 1343). The reading instructor noted that the Wilson program was very repetitive, "followed the same sequence of activities over and over," and, because the student came to her "every other day," she spent "a little more time" on certain items with him and sometimes "not so much," as he learned quicker in some

ways (Tr. pp. 1377-78). Further, she reviewed the levels of the Wilson Reading Program in detail that the student progressed through during the 2021-22 school year and indicated that in preparing for the student's annual review, "numerous teachers . . . saw a drastic improvement in his overall performance in reading" (Tr. pp. 1354-90, 1411-14). The reading instructor also testified that she "[taught] specifically to the child and the child's needs" and there were parts of the Wilson comprehension piece that she did not implement with the student, and she indicated that she conferred with the certified Wilson consultant, "who came periodically from [the] L & M [Institute]" who agreed that this was an appropriate course of action (Tr. pp. 1354, 1534-36).

Given the foregoing evidence, I find insufficient basis in the hearing record to disturb the IHO's determination that the IEPs developed for the student for the 2021-22 school year addressed the student's reading needs and that the district delivered reading instruction to the student which allowed the student to make progress. Even if I had found deficiency that rose to a denial of a FAPE to the student, I would not find any equitable relief was necessary under the circumstances present in this case.

### 4. Speech-Language Therapy

The parents argue that the September 2021 CSE failed to recommend daily speech-language therapy notwithstanding the recommendations of private evaluators, and refused to consider additional sessions after school.

At the June 2021 annual review CSE meeting, the speech-language pathologist's update indicated that the student occasionally "stumbled" on multisyllabic words when in a sentence, but he was aware and would slow down and try again (Dist. Ex. 5 at pp. 6-7). She also reported that he was making "nice progress" with his goal of understanding and discussing body language and that he was able to appropriately initiate a conversation with peers in in his classes and after school clubs (id. at p. 7). The IEP reflected the parents' concern that the student needed to "improve his comprehension skills, vocabulary, and social skills" (id.). As noted above, the CSE recommended one 42-minute session of group speech-language therapy on alternate days and one 42-minute session of individual speech-language therapy per week (id. at p. 10).

For the October 2021 CSE reconvene meeting, the committee reviewed the June 2021 neuropsychological evaluation and the June 2021 speech and audiology evaluation, and both private evaluators attended the meeting (see Dist. Exs. 4 at pp. 1-4; 18 at p. 3; see also Dist. Ex. 39; Parent Ex. H). Although the student achieved a score in the average range (25th percentile) on the formulating sentences subtest of the CELF-V, he scored "well below expectations" (9th percentile) on the semantic relationships subtest (Dist. Ex. 39 at p. 14). In addition, the evaluator indicated that the student struggled with the tasks when administered the Test of Integrated Language and Literacy Skills (TILLS) subtests of vocabulary awareness, listening comprehension, and social communication, with all student scores at or below the 4th percentile (id. at pp. 14-15). On the Test of Problem Solving-Adolescent, 2nd Edition (TOPS-2), which measures the ability to use language to understand social situations, the student received an overall score in the below average range (id. at p. 15). The evaluator summarized that the student "demonstrated consistent and significant deficits with regard to receptive language processing and supra-linguistic, or pragmatic language processing skills" (id. at p. 25). The evaluator indicated that these challenges were "often observed in students with Autism Spectrum Disorders," but that the student's deficits "warranted targeted and consistent remediation" (id. at pp. 25-26).

Within the June 2021 neuropsychological evaluation report, the evaluator recommended, among other things, that the student receive daily speech-language therapy (30-45 minutes, two times per week individual, three times per week in a small group) with a "focus on social pragmatics, vocabulary knowledge, and receptive/expressive language processing" (Dist. Ex. 39 at p. 28). The evaluator who completed the June 2021 neuropsychological evaluation testified that she recommended daily speech-language therapy because the student was "ready" and needed that level of "dedication" and "repetition" to make progress (Tr. pp. 1865-66).

As part of the June 2021 speech-language and audiology assessment, the speech-language pathologist who conducted the evaluation administered the Comprehensive Assessment of Spoken Language-Second Edition (CASL-2) to the student, which yielded scores in the deficient range on the receptive, expressive, and sentence expression subtests; scores in the below average range on the idiomatic language, grammatical morphemes, inference, and double meaning subtest; and an average score on the sentence comprehension subtest (Parent Ex. H at pp. 2-10). The student was also evaluated for an auditory processing disorder, and administration of the auditory tests "Speech-in-Noise, Staggered Spondaic Words and Phonemic Synthesis" yielded "below age-appropriate" scores on all three tests (id. at p. 12). The evaluating speech-language pathologist recommended that the student receive speech-language therapy services, at a minimum, five times per week and also recommended several environmental modifications to assist the student with his audiology needs (id. at p. 15).

The September 2021 CSE meeting minutes indicated while the student's audiology evaluation results were consistent with an auditory decoding deficit, the evaluating speech-language pathologist did not recommend an FM system for the student at that time as she reported that the student's ability to discriminate sounds in noise was poor, but his auditory attention was "fairly good" (Dist. Ex. 6 at p. 3).[29] However, the CSE chairperson indicated that the evaluating speech-language pathologist recommended more direct instruction in auditory processing, and that, in response, the CSE added an additional 42-minute session of individual speech-language therapy and an additional speech-language annual goal to address the auditory processing needs (Tr. pp. 200-01, 204-05). The annual goal added provided that "[g]iven a variety of instructional methodologies including computer assisted programs," the student would "explain and/or demonstrate the use of two or more compensatory strategies . . . to assist him with auditory processing of information" (Dist. Ex. 6 at p. 11). As compensatory strategies, the goal included examples such as chunking, verbal rehearsal, paraphrasing, lists, and technology or use of external aids (id.). The CSE chairperson indicated that the district used the computer-based program Fast ForWord as a "strategy" in part to address this goal (Tr. pp. 209-10).

The CSE chairperson also indicated that the evaluating speech-language pathologist "advocated" that the auditory processing goal "could only be addressed through an individual" session of speech-language therapy because the goal required "more specific hearing and listening to address the skill set" (Tr. pp. 204-05, 212).[30] However, the CSE chairperson indicated that the

---

[29] The evaluating speech-language pathologist was an audiologist (Tr. p. 1900; see Parent Ex. H at p. 16). She opined that the student would not benefit from amplification but required more instruction in the auditory manipulation and processing of sounds/information (Dist. Ex. 6 at p. 3).

[30] The evaluating speech-language pathologist disagreed with the use of Fast ForWord (Tr. p. 1921).

student's group sessions of speech-language therapy still addressed the student's needs related to vocabulary and social language (Tr. pp. 211-12). The CSE chairperson explained that, with the recommendation for group speech-language therapy on alternating days and two weekly sessions of speech-language therapy, the student would receive, in total, five sessions per six day cycle, so that there was only one day every other week on which the student would not receive speech-language therapy (Tr. pp. 324-25).

In making the recommendation to add the session of individual speech-language therapy, the CSE also considered "ways to accomplish the support systems" taking into account the student's activities and schedule (Tr. p. 228). Given that the student liked his elective classes such as technology and art, the committee resolved to remove one period of the 15:1 special class for ELA to allow for the additional period of speech-language therapy (Tr. pp. 228-30, 326-27).

The CSE meeting minutes reflect that the CSE considered recommending three weekly sessions of individual speech-language therapy but that this option was rejected in favor of the increase to two weekly sessions of individual speech-language therapy because the student was "making progress" and an addition increase would result in less time in the classroom (Dist. Ex. 6 at pp. 3-4). The CSE also considered but rejected the option of providing speech-language therapy before or after school because the student's needs could be met during the school day (id. at p. 4).

Taking into account the student's progress from the 2020-21 school year, the input from the private evaluators, and the balancing of the student's schedule, the evidence in the hearing record indicates that the September 2021 struck the appropriate balance in adding one individual session of speech-language therapy to the student's IEP and did not deny the student a FAPE.

## C. 2022-23 School Year (June 2022, September 2022 IEPs)

The CSE convened on June 16, 2022 for the student's annual review and to develop the student's IEP for the 2022-23 school year (Dist. Ex. 53). The hearing record shows that the June 2022 CSE relied on the student's June 2022 report card, June 2022 progress notes, teacher collected data, universal screening results (AIMS Web), Wilson Assessment of Decoding and Encoding (WADE) results, as well as staff and parent input (Dist. Exs. 53 at p. 4; 54 at p. 3). To meet the student's special education needs, the June 2022 CSE recommended that the student attend a 15:1+1 special class (consisting of five periods per week of social studies, five periods per week of science, seven periods per week of math, and six periods per week of ELA) and receive one 42-minute session of group speech-language therapy on alternate days, two 42-minute sessions of individual speech-language therapy per week, two 30-minute sessions of individual counseling per month, and 13 60-minute sessions of individual parent counseling and training per year with location listed as home/school/community, as well as five 30-minute team meetings per year with the parents and rotating school staff (Dist. Ex. 53 at pp. 16-17).[31] The June 2022 CSE meeting minutes reflected that the student would attend a daily 42-minute session of multisensory reading

---

[31] For summer 2022, the CSE recommended: four 45-minute sessions of resource room per week, one 30-minute session of individual speech-language therapy per week, and one 60-minute session of parent counseling and training with location listed as home/school/community for the extended school year (Dist. Ex. 53 at p. 18).

instruction as an AIS (id. at p. 3). For assistive technology, the June 2022 CSE recommended access to an FM system during academic instruction and access to a Chromebook (id. at p. 17).[32]

Relevant to the educational planning that took place for the student's 2022-23 school year is the student's progress during the 2021-22 school year in a similar program. According to the June 2022 CSE meeting minutes, the student's then-current report card reflected grades that were documented as follows: English 88, math 88, social studies 88, science 86, art 98, home and careers 90, and physical education 100 (Dist. Ex. 53 at p. 2).[33] In addition, the CSE reviewed the student's 2021-22 annual goal progress report, and noted that the student was demonstrating satisfactory progress toward every IEP goal (id.).[34] The student's reading instructor reported that the student had progressed from level 1.3 through level 5 on the WADE and was then beginning level 6 (id.). The student's speech-language pathologist reported that he had "a great year overall" and noted his progress in comprehension, social pragmatic language, using and recalling the strategies of chunking, repetition and visualization and also his needs in decoding, specifically with nonsense words (id.). The June CSE meeting minutes reflected the student's counselor's update which indicated that the student had made progress using the supports as needed but had continued needs to develop skills to work through social situations (id.). His special education teacher indicated that the student continued to need repetition of previously taught material, had made good progress in math and writing mechanics, benefited from visual aids, graphic organizers, checklists and outlines for writing, and, with moderate assistance, was successful "using more complex language in his writing" (id.). His teacher also recommended an accommodation of "tests read" to the student as he continued to have decoding needs evidenced from previous assessments (id. at p. 2).

According to the June 2022 CSE meeting minutes, the parents shared their concerns about the student's difficulty completing word problems in math, his ability to remember the steps when taking a test, and that his style of learning seemed "very rote and memorization based"; however, the parents also reported but that the student was "always positive about school" (Dist. Ex. 53 at p. 3). The parents also expressed continued concern regarding the student's reading skills and they and the student's reading instructor both advocated at the CSE meeting for multisensory reading instruction to occur daily during the 2022-23 school year (id.). The parents stated that the student informed them that the FM system helped him and that he enjoyed his speech sessions (id.). The parents also requested that the parent counseling and training location include the community (id.).

---

[32] The CSE reconvened on September 13, 2022 for a requested review, but this reconvene occurred after the parents' filed their amended due process complaint notice in this matter (compare Dist. Ex. 62, with Parent Ex. A). The September 2022 CSE modified the student's annual goals (including self-advocacy in a social/emotional goal and adding goals related to study skills/executive functioning) and increased the 15:1+1 special class for ELA to eight periods per week (Dist. Ex. 62 at pp. 2-3; compare Dist. Ex. 62 at pp. 15-17, with Dist. Ex. 53 at pp. 14-16).

[33] The student's final report card for the 2021-22 school year reflected the following final grades: English 86, math 85, social studies 89, science 83, art 100, technology 97, home and careers 96, physical education 100, and literacy "pass" (Dist. Ex. 45).

[34] The student's final annual goals progress report for the 2021-22 school year reflected that the student achieved 12 out of 13 of his annual goals (Dist. Ex. 42). For the executive functioning annual goal, the progress report does not reflect reporting for the final quarter but indicated that, for the first three quarters, the student was making satisfactory progress and was expected to achieve the goal (id. at p. 10).

With respect to executive functioning, as with the 2020-21 school year, the June 2022 IEP included an annual goal related to breaking down large assignments and projects into smaller tasks and listed several accommodations and supports to address the student's management needs including visual cues to assist with academics and situations "requiring to pull on his executive functioning skills throughout the day" (including visual schedules, checklists and examples given of problems and questions), small group instruction, repetition and review of previously learned concepts, breaks as needed, support when anxious or losing focus, frequent check-ins, use of a calculator, ongoing daily support of organizational strategies, simplifying complex directions, highlighting key information in directions, access to a computer, and visual cues during academic instruction (Dist. Ex. 53 at pp. 12, 15, 16).

With respect to reading, the June 2022 IEP included annual goals that specified the student would receive "explicit, sequential reading instruction" to work on decoding, encoding, and reading and spelling of high frequency words using "the Wilson Reading Program" (Dist. Ex. 53 at p. 11). Similar to the 2020-21 school year, specialized reading instruction was not specified among the recommended special education programs and services on the IEP; however, the intention for the student to receive reading instruction through AIS was clear from the meeting minutes attached to the front of the IEP document (Dist. Ex. 53 at pp. 3, 16).

The parents argue that, after receiving reading instruction for the 2021-22 school year, the student had to repeat level four and five of the multisensory reading program, demonstrating the inappropriateness of the reading instruction offered by the district. The student's reading instructor testified that, after assessing the student using the WADE in September 2022, she noted that he had lost some of the skills over the summer that were required for him to go on to level 6 of the Wilson program, and she noted, "repeat level in September 2022" on the front of the assessment page (Tr. pp. 1503-05).[35] Further, much of the reading instructor's data was entered as evidence and, during the impartial hearing, she explained what particular lesson, "block," or test that she implemented with the student and the subsequent course of action taken from the results of these activities (Tr. pp. 1500-09, 1513-18, 1529-40). When asked whether she "followed the Wilson [program] with fidelity" the instructor testified that "fidelity. . .is teaching what Wilson has for me to teach the best. . .without limiting the student to be able to learning more or to being able to learn things a little differently if a little different approach is more appropriate for that child" (Tr. pp. 1541-42). She also indicated in her testimony that she "went through every step of the lesson" and "did more than the lesson because there were things that the students needed that were not in the program" (Tr. p. 1542). The teacher's testimony is convincing because the CSE did not decide to rely on the Wilson Reading Program exclusively, nor was it required to, and it was permissible for the teacher in her professional judgment to use Wilson amongst a number of approaches in the student's instruction. (see A.G. on behalf of J.G. v. Bd. of Educ. of Arlington Cent. Sch. Dist., , 2017 WL 1200906, at *9 [S.D.N.Y. Mar. 29, 2017] [noting that in response to the parent's

[35] State regulations provide that, students "shall be considered for 12-month special services and/or programs in accordance with their need to prevent substantial regression" (8 NYCRR 200.6[k][1]). "Substantial regression" is defined as "student's inability to maintain developmental levels due to a loss of skill or knowledge during the months of July and August of such severity as to require an inordinate period of review at the beginning of the school year to reestablish and maintain IEP goals and objectives mastered at the end of the previous school year" (8 NYCRR 200.1[aaa], [eee]). Here, it does not appear that the student attended the summer program recommended in the June 2022 IEP (see Tr. p. 1444; Dist. Ex. 53 at p. 18). Accordingly, some regression in skills would be expected.

challenges of a lack of "fidelity" to the Wilson reading system, there is no requirement that any particular methodology be used, or that it be used exclusively]). It was not necessary for the CSE use the IEP to further micromanage or limit the instructional methodologies used by the teacher.

Finally, with respect to speech-language therapy, as the student made progress during the 2021-22 school year with the two individual sessions per week and the group sessions every other day and the June 2022 CSE did not have any new information before it that would warrant a different recommendation, the continuation of a similar speech-language therapy mandate for the 2022-23 school year was appropriate.

Overall, the evidence in the hearing record reflects that for all three school years at issue, the CSEs considered the views of the parents and the private evaluators but had information before them demonstrating that the student was advancing grade to grade and making academic progress in the district curriculum. As alluded to above, "[a]lthough past progress is not dispositive, it does 'strongly suggest that' an IEP modeled on a prior one that generated some progress was 'reasonably calculated to continue that trend'" (S.H., 2011 WL 6108523, at *10, citing Thompson R2–J Sch. Dist., 540 F.3d at 1153; see also F.L. v. Bd. of Educ. of Great Neck U.F.S.D., 274 F Supp 3d 94, [E.D.N.Y. 2017] [finding a substantially similar program appropriate in light of the student's progress in the preceding school year]; P.C. v. Rye City Sch. Dist., 232 F. Supp. 3d 394, 413-15 [S.D.N.Y. 2017] [examining carryover of goals and services from a student's IEP from a previous school year and noting that, "[w]here a student's needs and objectives remain substantially the same, '[i]t is especially sensible that [an IEP] would reflect continuity with [a student's] needs and objectives as of [previous years,]'"], quoting L.B. v. New York City Dep't of Educ., 2016 WL 5404654, at *11 [S.D.N.Y. Sept. 27, 2016]; D.D-S. v. Southold Union Free Sch. Dist., 2011 WL 3919040, at *12 [E.D.N.Y. Sept. 2, 2011] [determining that evidence of likely progress was "the fact that the [challenged IEP] was similar to a prior IEP that generated some progress"], aff'd, 506 Fed. Appx. 80 [2d Cir. Dec. 26, 2012]; J.G., 777 F. Supp. 2d at 650 [finding that when the student made some progress under a previous IEP, it was not unreasonable for the CSE to propose an IEP "virtually identical to" the previous one]; M.C., 2008 WL 4449338, at *16 [determining that when the IEP at issue mirrored a past IEP under which the student "demonstrated significant progress," the IEP at issue was reasonably calculated to afford the student educational benefit]; see generally Application of a Student with a Disability, Appeal No. 12-064; Application of the Bd. of Educ., Appeal No. 11-128).

Moreover, the district was not required to maximize the student's potential (Rowley, 458 U.S. at 189, 199). Overall, the district staff who contributed to the IEP development were responsive to the parents' concerns and requests and continually adjusted the student's programming, services, and annual goals to respond to new information available.[36]

---

[36] In light of the level of parental participation that occurred over several CSE meetings for each school year, there is absolutely no merit to the parents' claim that the district denied them an opportunity to participate in the educational planning for the student. Although school districts must provide an opportunity for parents to participate in the development of their child's IEP, mere parental disagreement with a school district's proposed IEP and placement recommendation does not amount to a denial of meaningful participation (see T.F. v. New York City Dep't of Educ., 2015 WL 5610769, at *5 [S.D.N.Y. Sept. 23, 2015]; A.P., 2015 WL 4597545 at *8, *10; E.F. v. New York City Dep't of Educ., 2013 WL 4495676 at *17 [E.D.N.Y. Aug. 19, 2013] [stating that "as long as the parents are listened to," the right to participate in the development of the IEP is not impeded, "even if the [district] ultimately decides not to follow the parents' suggestions"]; P.K. v. Bedford Cent. Sch. Dist., 569 F.

## D. Transition Plans

I will separately address the parents' allegation that the IHO erred in finding that the CSEs engaged in appropriate transition planning for the student for the 2021-22 and 2022-23 school years.

The IDEA—to the extent appropriate for each individual student—requires that an IEP must focus on providing instruction and experiences that enables the student to prepare for later post-school activities, including postsecondary education, employment, and independent living (20 U.S.C. § 1401[34][A]; see Educ. Law § 4401[9]; 34 CFR 300.43; 8 NYCRR 200.1[fff]). Accordingly, pursuant to federal law and other regulations, an IEP for a student who is at least 16 years of age (15 under State regulations), or younger if determined appropriate by the CSE, must include appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, if appropriate, independent living skills, as well as transition services needed to assist the student in reaching those goals (20 U.S.C. § 1414[d][1][A][i][VIII]; 34 CFR 300.320[b]; 8 NYCRR 200.4[d][2][ix]). Transition services must be "based on the individual child's needs, taking into account the child's strengths, preferences, and interests" and must include "instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation" (20 U.S.C. § 1401[34][B]-[C]; 34 CFR 300.43[a][2]; 8 NYCRR 200.1[fff]). In addition, State regulation requires districts to conduct vocational assessments of students at age 12 to determine their "vocational skills, aptitudes and interests" (8 NYCRR 200.4[b][6][viii]).

Within the June 2021 neuropsychological evaluation report, the evaluator noted the parents' concerns across all composite areas of adaptive functioning and indicated that it was "critical that [the student] has access to transition planning supports to help him build his skills" (Dist. Ex. 39 at p. 27). The evaluator recommended that the student's IEP include "goals related to transition planning (including career assessments, career/vocational training opportunities and exploration, and skills training on daily self-help skills both at home and within the community)" (id. at p. 30). The evaluator indicated that the goals "should be guided by [the student's] deficits in the areas of Communication, Functional Academics, Self-Direction, Leisure skills, Community Use, and Health/Safety" (id.).

In September 10, 2021, the student completed a questionnaire as the level 1 vocational assessment (Dist. Ex. 48). To many of the questions posed about post-school goals, the student responded that he did not know yet (id.).

The CSE did not discuss transition planning at the September 2021 CSE meeting (see Tr. pp. 336-37). During the October 2021 CSE meeting the parents indicated that they wanted the student to "work with a job coach in the future" and the district told the parents they could speak to the district's transition coordinator "for additional information and resources" (Dist. Ex. 7 at p.

Supp. 2d 371, 383 [S.D.N.Y. 2008] [noting that "[a] professional disagreement is not an IDEA violation"]; Sch. for Language & Commc'n Dev. v. New York State Dep't of Educ., 2006 WL 2792754, at *7 [E.D.N.Y. Sept. 26, 2006] [finding that "[m]eaningful participation does not require deferral to parent choice"]).

2). In addition, the committee reviewed the student's responses to the level 1 vocational assessment at that time (id. at p. 3).

The CSE chairperson testified that as students get "closer to 15" that she began to consider transition plans for them but that the district began assessing students before that age (Tr. pp. 335-36, 337). The CSE chairperson elaborated that for the student, while the CSE did not consider a transition plan "in the formal sense" for the 2021-22 school year, the committee did include most of the aspects of transition planning highlighted by the private evaluator in other aspects of the IEP, such as through parent counseling and training, counseling services to address the student's self-direction and ability to self-advocate, and by addressing the student's functional communication and academic needs within the special class (Tr. pp. 338-39).

As the student was turning 15 during the 2022-23 school year, the June 2022 IEP included results from the September 2021 level 1 vocational assessment, postsecondary goals, and a coordinated set of transition activities (Dist. Ex. 53 at pp. 11, 13-14, 19-20). The IEP indicated that the student became "nervous and agitated" when he completed the level 1 vocational assessment questionnaire, didn't understand some questions, required prompting with examples, and "had a hard time conceptualizing what the future meant for him" (id. at p. 11). For post-secondary goals, the IEP provided that the student would "attend a four-year college," noting that the student "expressed an interest in drawing," seek employment in an area of interest, and independently drive or take the bus to and from work (id at p. 13). The IEP indicated that the student's "transition service needs" were to improve reading comprehension skills, written expression skills, and math skills and that the student would complete necessary coursework to earn a Regents high school diploma (id. at pp. 13-14). As for a coordinated set of transition activities to facilitate the student's movement to post-school activities, the IEP listed instruction (noting that the student would "articulate accommodations needed in an educational setting" and "participate in IEP meetings to practice advocacy skills"), related services (speech-language therapy to improve communication skills and counseling to demonstrate appropriate social/emotional skills), community experiences (research to identify career interests and events and activities in the community to support such interest), and development of employment and adult living objectives (complete a career interest profiler) (id. at p. 19). The IEP indicated that, considering the student's then-current levels of performance, neither a functional vocational evaluation nor inclusion of activities pertaining to acquisition of daily living skills was needed at that time (id. at p. 20).

During the impartial hearing, the parents called a transition specialist as an expert witness (see Tr. pp. 1754-55; Parent Ex. NN). The transition specialist reviewed the transition plan set forth in the June 2022 IEP and took issue with, among other things, the inclusion of drawing as an area of focus for the student, the lack of services to support the goal of attending college, the lack of provisions to address independent living skills, and the district's failure to conduct a functional vocational assessment (see Tr. pp. 1768, 1772-74, 1776, 1780, 1871).

Here, even if the CSEs that convened prior to the student's 15th birthday could have developed a transition plan and even if the transition plan developed at the June 2022 CSE meeting could be characterized as inappropriate or insufficient as the parents allege, it has been found that "a deficient transition plan is a procedural flaw" that will only rise to a denial of a FAPE if it impeded the student's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or caused a

deprivation of educational benefits (M.Z., 2013 WL 1314992, at *6, *9, citing Klein Indep. Sch. Dist. v. Hovem, 690 F.3d 390, 398 [5th Cir. 2012] and Bd. of Educ. of Tp. High Sch. Dist. No. 211 v. Ross, 486 F.3d 267, 276 [7th Cir. 2007]; see F.L. v. New York City Dep't of Educ., 2016 WL 3211969, at *8-*9 [S.D.N.Y. June 8, 2016]; C.W. v City Sch. Dist. of the City of New York, 171 F. Supp. 3d 126, 134 [S.D.N.Y. 2016]; J.M. v New York City Dep't of Educ., 171 F. Supp. 3d 236, 247-48 [S.D.N.Y. 2016]; A.D. v. New York City Dep't of Educ., 2013 WL 1155570, at *11 [S.D.N.Y. Mar. 19, 2013]). Here, the June 2022 transition plan sufficiently aligned with the student's needs relate to preparing for post-secondary life. Accordingly, the parents' allegations about the transition plan do not support a finding that the district denied the student a FAPE.

## VII. Conclusion

Having determined that the evidence in the hearing record establishes that the district offered the student a FAPE for the 2020-21, 2021-22, and 2022-23 school years, the necessary inquiry is at an end.

**THE APPEAL IS DISMISSED.**

**THE CROSS-APPEAL IS SUSTAINED.**

**IT IS ORDERED** that the IHO's decision, dated November 13, 2023, is modified by reversing that portion which found that the district denied the student a FAPE for the 2020-21 school year and ordered the district to provide the student with 100.8 hours of compensatory speech-language therapy services.

Dated:    **Albany, New York**
          **February 28, 2024**

**JUSTYN P. BATES**
**STATE REVIEW OFFICER**